**INMATES OF the BOYS' TRAINING SCHOOL et al.**

v.

**John AFFLECK, Director, Department of Social and Rehabilitative Services, et al.**

**Civ. A. No. 4529.**

United States District Court,
D. Rhode Island.

July 28, 1972.

1356

Harold Krause, Jr., Cary J. Coen, Kenneth F. MacIver, Jr., Robert L. Barton, Barry A. Fisher, Barry Vogel, V. Paul McGinn, Rhode Island Legal Services, Providence, R. I., Donald King, Ellen C. Hanson, Juvenile Law Center, St. Louis, Mo., Ann Wagner, Michael Davidson, NAACP Legal Defense Fund, New York City, for plaintiffs.

· Richard J. Israel, Atty. Gen., Donald P. Ryan, Asst. Atty. Gen., Bennett R. Gallo, Sp. Asst. Atty. Gen., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

The indignities suffered by juveniles who did not respond well to their confinement to the Boys Training School and the attempts of Training School officials to cope with the disciplinary and running-away problems presented by such juveniles lead to the institution of this Civil Rights action. Confinement of these juveniles in the maximum security Adult Correctional Institution, in the resuscitated relic of a former women's prison, in dim and cold steel cellblocks, and in a wing of the adult medium security prison is argued to violate plaintiffs' constitutional rights to due process, and equal protection, and to constitute cruel and unusual punishment.

Five named plaintiffs, for themselves and on behalf of a class, seek a preliminary injunction stopping confinement of juveniles in the Adult Correctional Institution Maximum Security building; in the solitary confinement cells of the Medium-Minimum Security building of the A.C.I.; and in Annex B, the old women's reformatory. They also seek to stop transfers of juveniles to the Youth Correctional Center (Annex C) of the Medium-Minimum Security Building and isolation of any juvenile in a room for more than two hours without a psychiatrist's certificate, and in any event, for more than 24 hours within a seven-day period. They also seek to define certain minimum requirements for conditions of confinement. While they do not seek to close Annex C immediately, they seek the return to the Training School of those juveniles transferred there without a judicial hearing.

Further prayers for relief raise, at the outside, important questions of the philosophy of treatment of juvenile offenders and, at base, vital questions of what rights juveniles retain in their confinement at state correctional centers. Arguing that these juveniles have a right to rehabilitative treatment, plaintiffs seek institution of vocational training, a drug rehabilitation program,

and a psychiatric counseling program at the Boys' Training School. They also seek a full day of schooling for juveniles under age of sixteen, three hours of outdoors athletics, and the right of the juveniles to obtain food daily from the canteen unless a meal is served after six p. m. daily.

Jurisdiction exists on 28 U.S.C. § 1343. This has been certified as a class action.

The Court has viewed all of the involved places of confinement. A temporary restraining order was entered in January 1972, prohibiting the use of Annex B, the old Women's Reformatory, prohibiting the administrative transfer of further juveniles to the maximum security Adult Correctional Institution (A.C.I.), and conditioning the use of Annex C and its cellblock. Plaintiffs have moved for a preliminary injunction based primarily on evidence produced at hearing, stipulations, and affidavits. The motion for preliminary injunctive relief seeks support also from this Court's order of March 30, 1972 invoking its Rule 37, Fed.R.Civ.P., powers to sanction defendants for their consistent failure to comply with both the discovery rules and this Court's orders under the Federal Rules of Civil Procedure. See Hodgson v. Mahoney, 460 F.2d 326 (1st Cir. 1972).

Defendants in this action are John Affleck, Director of the Rhode Island Department of Social and Rehabilitative Services; Anthony Orabone, Assistant Director of the Department in charge of the Division of Children and Youth Services; John Sharkey, Assistant Director of the Department in charge of the Division of Correctional Services; Francis Howard, Warden of the Adult Correctional Institution; Joseph Devine, Superintendent of the Boys Training School; the Board of Regents for Education for Rhode Island; Frederick Burke, the Commissioner of Education; William Robinson, the Director of the Division of Elementary and Secondary Education, Rhode Island Department of

Education; and Edward Costa, the Title I Coordinator of the Division of Elementary and Secondary Education, Rhode Island Department of Education.

### Preliminary Procedural Points

Defendants have sought dismissal of this action for failure to state a claim on which relief may be granted. Rule 12(b)(6), Fed.R.Civ.P. They have also asked that this Court abstain from decision.

■ This action raises questions of substantial constitutional import and will not be dismissed. As the Supreme Court recently held in Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), summary placement of an inmate in solitary confinement states a cause of action under 42 U.S.C.A. § 1983. This law suit goes to the conditions of confinement of juveniles and, as such, is well within the jurisdiction of the federal courts. See Urbano v. McCorkle, 334 F.Supp. 161 (D.N.J.1971).

■ The intercession of a federal court into a state correctional system is a matter of much gravity and is not done here lightly. The Court, having entered a consent decree recently in a case concerning conditions at the Rhode Island Adult Correctional Institutions, was hopeful that the issues in this case could be similarly resolved, and accordingly, has encouraged the parties to negotiate their differences. Such efforts were unavailing; rather, as the record in this action demonstrates, this Court has had great difficulty in securing compliance from defendants with even customary discovery orders. In the circumstances of this case, the Court finds no equitable reason to withhold from ruling.

■ Nor does the Court find any justification in precedent to apply the abstention doctrine here. This case does not present issues of state law, the clarification of which would "obviate the need for a federal constitutional decision or would present the federal constitutional issue in significantly altered

light." Wulp v. Corcoran, 454 F.2d 826 (1 Cir. 1972). To defer this case to adjudication elsewhere would be to cause unnecessary delay and injury to these plaintiffs, and is not required by precedent. Cluchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971). As this Court has previously indicated, it will not defer adjudication in respect to the unacceptable "hands-off" doctrine which denies that inmates have enforceable rights. Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970).

■ Exhaustion of administrative remedies is not a prerequisite to a § 1983 suit attacking conditions of confinement. Rodriguez v. McGinnis, 456 F.2d 79 (2d Cir. 1972); Edwards v. Schmidt, 321 F.Supp. 68 (W.D.Wis. 1971). Even if it were, there do not appear to be any administrative remedies available here.

Finally, in terms of comity, I would note that for the most part this law suit does not attack actions taken by the state legislature or by the state judiciary. Primarily under attack are conditions resulting from decisions made in the administrative discretion of those defendants who are officials of the Boys Training School. It would be well to take heed of what Kenneth Culp Davis teaches:

> " 'Where law ends tyranny begins.' I think that in our system of government, where law ends tyranny need not begin. Where law ends, discretion begins, and the exercise of discretion may mean either beneficence or tyranny, either justice or injustice, either reasonableness or arbitrariness."

Davis, Discretionary Justice, 3 (1969) Of course, defendants have made these administrative decisions in light of the resources the legislature has made available to them.

### Findings of Fact

The class of inmates at the Boys Training School may be divided into five sub-classes, depending on the reason for commitment: 1) those voluntarily com-

mitted by their parents, R.I.G.L. § 13–4–8; 2) those awaiting trial; 3) those convicted of delinquency, R.I.G.L. § 13–4–9, § 14–1–36; 4) those adjudicated wayward, R.I.G.L. § 14–1–36; and 5) those found to be dependent or neglected, R.I.G.L. § 14–1–34.

Most of the boys at the Training School are housed in cottages on the School grounds. For reasons concerned mostly with discipline and escape problems, some boys have been transferred from the cottages to functionally distinct and geographically separate institutions, known as Annex B, Annex C, Annex C cellblock, and the Maximum Security building of the Adult Correctional Institution (ACI). Some juveniles in Annex C and its cellblock were transferred there directly pursuant to court proceedings. As stipulated by the parties, juveniles otherwise are transferred to Annex B, Annex C and its cellblock, and Maximum Security without judicial hearing. It has been the past practice of defendants to effectuate these transfers without administrative hearing or prior notice. There are no specific rules or regulations which indicate what offenses will result in transfer of a juvenile to Maximum Security.

A registered nurse and a licensed practical nurse, located in the main building at the BTS, are on duty from 6:30 a. m. to 3 p. m. on weekdays, and on call for emergencies until 10 p. m. There is no psychiatrist or clinical psychologist on the BTS staff. A routine physical examination is given on entrance of a boy to the Training School. There is evidence, and I so find, of at least two probable suicide attempts by boys who received no medical or psychiatric care proximately following the attempts. The response of BTS supervisors to these suicide attempts was solitary confinement. There is other evidence indicating that the boys have not received adequate medical care; however, there is also contradicting evidence.

The decisions to transfer juveniles to the Maximum Security Building of the ACI is made by the Superintendent of the BTS, subject to the approval of the Assistant Director for Correctional Services R.I.G.L. § 13–4–12. Administrative transfers to Annex C are made on the decision of the Superintendent of the BTS alone. Boys detained at the BTS pending a court hearing have been administratively transferred both to the ACI and to Annex C. Boys confined to the BTS for truancy have been administratively transferred to Annex C.

*Annex B*

Annex B is a wing of the old women's reformatory built in 1863 and contains dingy cement rooms, approximately six feet by eight feet. Each room is furnished only with a bed, a sink, and a toilet. The toilet is flushed from outside the room by BTS personnel. The only opening in these cells is a barred window on the far wall, which opens onto a catwalk from which the inmate is observed.

Two of these cells are stripped isolation cells, containing nothing but a toilet, and a mattress on the floor. The cells have, at times, not had artificial lighting. In one of the cells, the window is boarded over, rendering it completely dark at times. These cells are known as "bugout" rooms and are used for solitary confinement of boys.

The boys confined to Annex B are never allowed to go outside and exercise. Indeed they are almost never allowed out of their cells. They are allowed out of their cells only to take daily showers and to get meal trays. Meals are eaten in the rooms. Some boys, who have been in Annex B for a specified period of time, are allowed out of their cells to watch television for a short time. There are a few magazines and books available. A teacher provides one and a half hours daily of education to some boys. This education consists chiefly of working math problems.

No nurse or doctor is on duty at Annex B. Medical care for an inmate must first be requested by a staff member. Even when medical care was so requested in Annex B, it was usually not forthcoming.

Boys are confined to Annex B for periods ranging from a few days to two and a half months. No visitors, and this includes parents, are allowed.

The solitary confinement cells in Annex B are used to punish infractions by boys committed after they are confined to Annex B. Boys have been kept in these "bug-out" rooms a maximum of three to seven days. One inmate testified, and I accept his testimony as true, that he was confined to the solitary confinement cell for a week, wearing only his underwear. The room was dark and was cold. He was not given toilet paper, soap, sheets, blanket, or change of clothes. He was not allowed to leave the room. His testimony is corroborated by similar testimony from other boys who have been confined there. Boys do not receive a physical or psychiatric examination either prior to, during, or after confinement in the "bug-out" room.

There is no psychiatrist or clinical psychologist on the Training School staff or engaged in regular counseling at the school. Psychiatric help has been requested for inmates by staff members and not received. There is an obvious need for psychiatric aid as the following incident demonstrates.

A staff member testified, and I accept his testimony as true, that while on duty at Annex B he observed a boy attempting to hang himself. He managed to get the boy down. Requesting instructions and assistance from his superiors, the staff member was told to put the boy in the "bug-out" room. He did. Once in the room the boy started banging his head into the wall. The staff member removed the hysterical boy from the room. Assistance arrived in the form of two employees of the BTS, one a truck driver. They stayed and talked to the boy for a short period of time then instructed the staff member to put the boy back in the "bug-out" room. Disobeying these instructions, the staff member talked with the boy in his office for several hours until the boy was calmer. No trained psychiatric help was given.

During the past year, Annex B, including the two isolation rooms has enjoyed full occupancy. This Court ordered Annex B closed in January, 1972, by temporary restraining order. Defendants have agreed to continue the restraining order and have not since used Annex B.

Annex B was considered to be less severe confinement than Annex C by Training School officials.

*Annex C*

Annex C, which is a closed-off wing of the Medium-Minimum Security building of the Adult Correctional Institution, is a series of rooms on either side of a long corridor. One or two boys occupy a room, secured by a locked door. The windows are barred and many are broken, rendering the rooms cold. Some windows and the bars on the windows have been broken by boys in escape attempts. Annex C is far from escape proof.

Annex C contains 16 rooms, 15 are used for the boys and one room is used for staff. There is also a shower room and a recreation room. Access is had to an outdoors fenced-in yard. The basic furnishings of each room are a desk, a chair, beds, and a small table. There is a small window in the door of the cell. Clothing, bedding, and toilet articles are issued.

Meals are taken in the adult cafeteria where the boys have some contact with adult inmates, although this contact is generally limited by BTS personnel. Breakfast is at 7 a. m.; lunch, at 11 a. m.; and dinner at 3 p. m. After 3 p. m. candy is available at the canteen for some of the boys. For those without the canteen privileges there is nothing to eat for the 16 hour period between 3 p. m. and 7 a. m.

In spite of the presence of the exercise yard, it appears that the boys are rarely allowed outside for exercise. It is alleged that boys have not used the yard since Summer of 1971. There is no nurse and no doctor on duty in Annex C, nor do they make regular visits there. There is a locked medicine chest available, but the boys complain that their medicine is not given to them.

There is a "level" program at Annex C, that is, depending on his progress, a boy may be advanced to a different level with more privileges. One variant with the different levels is the amount of time a boy is allowed out of his cell. When not in their cells, the primary recreational activities in which the boys engage are watching television, roaming the hall, playing cards or doing calisthenics.

Boys under sixteen years of age are required to receive some educational training. A teacher comes for two hours a day. He teaches two groups, each of which receives an hour of education. Education primarily consists of doing mathematics problems. There are no math textbooks but there is a history book on which tests but not lessons are given. It is unclear whether boys over 17 years of age are allowed to participate in this education. There are inmates who have surpassed the level of education taught at Annex C so find it useless. Students have been, at times, excluded from this schooling by BTS officials.

There is no vocational training. A counsellor comes regularly, but, as testified, the plaintiffs may individually see him for only ten minutes weekly or less. The visitors allowed other than the counsellor are professionals such as attorneys. There are no activities such as arts or crafts, nor are there individualized programs. There is a ping-pong table some of the inmates are allowed to use. While defendants have submitted a schedule indicating there are "Human Relations" sessions, the overwhelming weight of the evidence to date is that there have not been any such sessions.

I accept as true the statement in plaintiffs' affidavits that boys are locked in their rooms for 24 hour periods for such offenses as inability to perform an exercise during calisthenics, "kidding around" with roommates, and making noise to get the guards to let them out to go to the bathroom. I also accept as true that guards sometimes ignore the boys' requests to go to the toilet or to open the window.

Transfers to Annex C are frequently grounded on escape attempts, and are accomplished without notice or hearing. There is evidence that the Assistant Director for Youth Services and the Superintendent of the BTS consider Annex C to be in need of change.

*Annex C Cellblock*

Located on the floor above Annex C is a series of small, dimly lit, steel-barred cells used for solitary confinement. Each cell is approximately eight feet by four feet, containing a metal slab bed and mattress, sink, and toilet. Boys confined there are released only to take showers, about twice a week. They get no exercise. The inmate's attorney, but not his family, is allowed to visit him there. Because windows on the wall opposite the cellblock are broken, the cells are cold. There is a small hole in the bars, through which meals, sometimes cold, are passed.

At times reading materials and toilet articles are given to the boys, at times they are withheld. Confinement to the cellblock is frequently for 15 day maximum periods. Clean sheets or underwear is not provided during the stay.

The offenses for which a boy is confined to the cellblock include running away, fighting, assault on guards, and homosexual behaviour.

There is no nurse or doctor on duty or who makes regular visits. A staff member testified, and I find as true, that on one occasion on coming on duty in the cellblock he discovered that a boy had slit his wrists, which were still

bleeding and covered with bloody towels. Notifying other staff of this and requesting medical care for the boy, he was told they already knew of it. No doctor came to attend the boy during the next eight hours, nor was any other care forthcoming.

*Maximum Security*

Juveniles have been transferred from the Boys Training School to cells amidst the adult population of sections of the Maximum Security Building at the ACI. The juveniles are subject to the same rules, punishments, and opportunities as the adult inmates. While rehabilitative programs are generally available, the juveniles have not participated in them.

They have continual contact with adult inmates and learn from these inmates the tricks of the trade of crime. They have been the subject of homosexual overtures and threats from adult inmates.

The ACI contains adult male convicts who are convicted of felonies or misdemeanors and adults accused of committing felonies and misdemeanors.

*Plaintiffs*

I find it necessary to preserve the vitality of these findings of fact by more detailed findings about particular plaintiffs.

Bernard Humes was sent to a cell in Maximum Security from Annex C. He escaped from Annex C in October of 1971 and was put in the Annex C cellblock when he was caught. He was visited there by Mr. DeLorenzo, Mr. Gorman, and Mr. Pendergast who told him he would have to remain in the cellblock for fifteen days. He remained there thirty days, until November 18, 1971. His cell lacked hot water and was cold. He did not have enough blankets to keep warm. He was only let out to shower, which took five or ten minutes, two or three times a week. On November 18, 1971, two Training School officials visited him and told him to gather his things, he was going to maximum security. He received no prior notice of this transfer.

Humes had been transferred to the ACI Maximum Security once earlier in his Training School career. His response to whether he then learned anything from the adults was, "Well, nothing that can be used in society, I mean, how to steal something bigger, like, before I went there, maybe."

Humes had earlier been confined to Annex B for running away, an activity in which he frequently engaged, and had spent time in the Annex B isolation room because "Somebody threw some soapy water in my eyes, and I bugged out because the supervisor wouldn't let me go and wash it out of my eyes."

Plaintiff James Young has been confined to the maximum security ACI. Prior to this, he had been locked in the cellblock of Annex C for 21 or 22 days for running away. He was given no prior notice or hearing, just told that he was confined for running away. He was only allowed out of the cell to take showers, two or three times a week. During most of his days in the cellblock there was no light in his cell, all of the bulbs being broken. The only visitor he was allowed was his attorney. Because of broken windows his cell was cold at night.

On November 18, 1971, without notice or judicial or administrative hearing, he was transferred to the maximum security section of the ACI. He is held in a cellblock with adult inmates. When asked whether he had learned anything at the ACI, he testified that he had learned how to do "better" B & E's (breaking and enterings) and to do armed robberies.

He testified that he had been in Annex B five to nine times, and had twice been put in Annex B's solitary cells, once for two or three days, and once for seven to ten days. The solitary cell was completely dark and was cold with winter air coming in through the knocked out window. He had no toilet paper, soap, sheets, blanket, or change of clothes. The only clothing he had was underwear. The covering on the mat-

tress was worn through and he lay on the springs. He was never allowed out of the cell.

Plaintiff, General Jordan, age 17, was sent to Annex B after he ran away from the Boys Training School. For two and a half months he languished in a small cell. Eventually he was released from his cell to watch television. He was never given any exercise during this period, or allowed outside. He did not read because he had read all of the books there and he did not participate in the classes because he had advanced beyond the level of arithmetic being taught. He got to see his counsellor, on his own request, three times during this period.

On December 1, 1971, the day he expected to return to Family Court for a hearing, he was instead transferred to Annex C. He testified that his room was cold at night because the window was broken; that when he wasn't in his cell, he watched television; and that he was allowed out of his cell from 9:30 a. m. to 12 noon, and from 3:30 p. m. to 9:30 p. m.

Plaintiff Stephen Griffiths is let out of his room in Annex C for six hours a day and then usually watches television or plays cards. He testified that in September, 1971 he asked to go to church and was told that was not allowed. He also testified that he was denied access to medical facilities to treat swollen throat glands.

He was placed in solitary confinement in the cellblock above Annex C. The only times during his 15 day confinement he was released from his cell were to take showers, once or twice a week. His request for reading materials and writing paper while in the cellblock was denied.

*Conclusions of Law*

This suit is concerned with the rights of boys confined to the Boys Training School. Not all of these boys have been convicted of violation of the criminal laws. Some are there because they are "wayward" children. R.I.G.L. § 14–1–3.

Among such "wayward" boys, are boys who are found to be truants from schools, disobedient boys, and boys who have run away from home "without good or sufficient cause." Parents may voluntarily commit their sons to the Training School. R.I.G.L. § 13–4–8. Boys may be sent there because of "idleness." R.I.G.L. § 14–1–4. Other boys may end up at the Training School because they have been found to be "dependent" or "neglected" by their parents. R.I.G.L. § 14–1–34. It is possible for a boy to be committed to the BTS not for something he does, but for what he is, that is, "neglected." Furthermore, boys who have been accused of "delinquency" but who have not been tried before the Family Court of Rhode Island may be committed to the Training School. All of these boys, without distinction as to how they came to the Training School, have been subject to the Superintendent's discretion to transfer them to Annex B, and Annex C and its cellblock, and the Maximum Security Building of the ACI.

The purpose of removing a juvenile from his family enunciated by the Rhode Island legislature is "to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents." R.I.G.L. § 14–1–2. He is to be removed from his parents only when "his welfare or the safety and protection of the public cannot be safeguarded without such removal." R.I.G.L. § 14–1–2.

The purpose of confinement of juveniles under Rhode Island law is "instruction and reformation," not punishment. R.I.G.L. §§ 13–4–1, 13–4–13, 13–4–15. An adjudication upon a juvenile does not have the effect of a conviction nor is such a child deemed a criminal. R.I.G.L. § 14–1–40.

■ Juvenile adjudicative proceedings must be conducted in compliance with the standards of Due Process of law, because, as was held by the United States Supreme Court in In Re Gault,

387 U.S. 1, 27–28, 87 S.Ct. 1428, 1443–1444, 18 L.Ed.2d 527 (1967):

"Ultimately, however, we confront the reality of that portion of the Juvenile Court process with which we deal in this 'case. A boy is charged with misconduct. The boy is committed to an institution where he may be restrained of liberty for years. It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes 'a building with whitewashed walls, regimented routine and institutional hours . . . .' Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees, and 'delinquents' confined with him for anything from waywardness to rape and homicide.

In view of this, it would be extraordinary if our Constitution did not require the procedural regularity and the exercise of care implied in the phrase 'due process.'"

As the Rhode Island Supreme Court has so aptly noted, "There is no age limitation contained in the constitutional guarantee of due process." In Re Holley, 268 A.2d 723 (R.I.1970). Due process does not guarantee to juveniles *all* rights in the adjudicative process which are constitutionally assured to an adult accused of a crime. It was the judg-

ment of the Supreme Court in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) that due process does not require a jury trial in state juvenile delinquency hearings. The opinion of Justice Blackmun, in which three justices joined, found that imposition of the jury trial requirement would subvert the special nature of juvenile proceedings and that the states should be allowed to experiment toward accomplishment of the juvenile system's rehabilitative goals. 403 U.S. at 547, 91 S.Ct. 1976.

Thus, the constitutional validity of present procedural safeguards in juvenile adjudications, which do not embrace all of the rigorous safeguards of criminal court adjudications,[1] appears to rest on the adherence of the juvenile justice system to rehabilitative rather than penal goals. See State ex rel. Londerholm v. Owens, 197 Kan. 212, 416 P.2d 259, 269 (1966). The Rhode Island legislature, in establishing its juvenile justice system, has specifically directed that it have rehabilitative, non-penal, goals.[2]

Rehabilitation, then, is the interest which the state has defined as being the purpose of confinement of juveniles. Due process in the adjudicative stages of the juvenile justice system has been defined differently from due process in the criminal justice system because the goal of the juvenile system, rehabilitation, differs from the goals of the criminal system, which include punishment, deterrence and retribution. Thus due process in the juvenile justice system requires that the post-adjudicative stage of institutionalization further this goal of rehabilitation. And whatever devia-

---

1. For instance, while conviction of a juvenile for conduct amounting to violation of a state statute or city ordinance requires that the "beyond a reasonable doubt" standard of proof be met, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, it is unclear whether a lesser standard of proof is required for adjudication upon a juvenile for conduct that does not amount to a violation of the criminal law. State v. Turner, 268 A.2d 732, 735 (R.I.1970).

2. The State has provided that certain juveniles, that is, those over age 16 who are charged with indictable offenses, be treated as adults and not be tried by the juvenile courts. R.I.G.L. § 14–1–7. It appears that such juveniles are committed to the ACI rather than to the Training School. See State v. DaFonseca, R.I., 286 A.2d 592 (1972).

tions, if any, from this goal of rehabilitation which might be tolerated as to those incarcerated juveniles convicted of violations of the criminal laws, such deviations are far less tolerable for the other classes of children incarcerated by the state. See Rozecki v. Gaughan, 459 F.2d 6 (1st Cir.1972).

As to at least one of the sub-classes of inmates at the BTS, those adjudicated juvenile delinquents, society also has an interest in being protected against their anti-social acts. As was said in Kent v. United States, 130 U.S.App.D.C. 343, 401 F.2d 408, 411–412 (1968):

> "Parens patriae requires that the juvenile court to what is best for the child's care and rehabilitation so long as this disposition provides adequate protection for society. . . . But it is clear that society can be protected without departing from civilized standards for the prompt and adequate care of disturbed children."

It is in this context that plaintiffs' claims are considered. See also Note, The Courts, The Constitution and Juvenile Institutional Reform, 52 B.U.L.Rev. 33 (1972).

*Annex B*

■ Although defendants have voluntarily closed Annex B, the issue of confinement of juveniles at Annex B is not moot. In closing Annex B defendants did not concede any unconstitutionality or illegality in its operation. Because the situation may again be changed, the issue is not moot. Nolan v. Fitzpatrick, 451 F.2d 545, 551 (1st Cir.1971).

Conditions at Annex B were deplorable, as defendants themselves must have recognized in stopping its use. Lest defendants find themselves pressing Annex B into use again because of lack of adequate facilities elsewhere, this Court enjoins the use of Annex B and orders that it be closed.

The entire Annex, and most particularly its inhuman solitary confinement cells fit well the language used in Jones v. Wittenberg, 323 F.Supp. 93, 99 (N.D.

Ohio 1971) aff'd 456 F.2d 854 (6th Cir. 1972):

> "We may suppose that the constitutional provision against cruel and unusual punishment was directed against such activities. In any event, when the total picture of confinement . . . is examined, what appears is confinement in cramped . . . quarters, lightless, airless, damp and filthy with . . . deprivation of most human contacts, except with others in the same sub-human state, no exercise or recreation, little if any medical attention, no attempt at rehabilitation, and for those who in despair or frustration lash out at their surroundings, confinement, stripped of clothing and every last vestige of humanity, in a sort of oubliette."

> "The constitutional prohibition against cruel and unusual punishment 'is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice.' Weems v. United States, 217 U.S. 349, 378, 30 S.Ct. 544, 553, 54 L. Ed. 793 (1910). If the constitutional provision against cruel and unusual punishment has any meaning, the evidence in this case shows that it has been violated. The cruelty is a refined sort, much more comparable to the Chinese water torture than to such crudities as breaking on the wheel."

Jones v. Wittenberg involved adult inmates; the instant case involves juveniles, who may not be treated like convicted criminals.

■ The fact that there is only some evidence of physical abuse of the boys does not immunize defendants from condemnation under the Eighth Amendment. The conditions in Annex B are insidiously destructive of the humanity of these boys. There were no or pitifully few "facilities or personnel for social services, exercise, recreation, reading, rehabilitation, or any other human resources to meet human needs." *Jones, supra,* at 97. To confine a boy without

exercise, always indoors, almost always in a small cell, with little in the way of education or reading materials, and virtually no visitors from the outside world is to rot away the health of his body, mind, and spirit. To then subject a boy to confinement in a dark and stripped confinement cell with inadequate warmth and no human contact can only lead to his destruction.

The prohibition on cruel and unusual punishment is not a static concept ". . . but may acquire meaning as public opinion becomes enlightened by a humane justice." Weems v. United States, 217 U.S. 349, 378, 30 S. Ct. 544, 553, 54 L.Ed. 793 (1910). The fact that juveniles are *in theory* not punished, but merely confined for rehabilitative purposes, does not preclude operation of the Eighth Amendment. The reality of confinement in Annex B is that it is punishment. It is punishment imposed on obdurate boys by defendant administrators of the Training School. The legislature could not constitutionally, and has not, directly authorized confinement of juveniles to the "bug-out" rooms of Annex B. Defendants cannot do, in their administrative discretion, that which the legislature could not constitutionally authorize. See Kautter v. Reid, 183 F.Supp. 352 (D.D. C.1960); Comment, 84 Harv.L.Rev. 456, 459 (1970).

The Eighth Amendment draws its meaning from the evolving standards of decency that mark the progress of a maturing society. Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). It is binding on the states through the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Affidavits submitted by plaintiffs' experts on the damaging effects of such solitary confinement are set out below:

Dr. Jerome Miller, Commissioner, Department of Youth Services for the Commonwealth of Massachusetts:

"My experience in penology led me to conclude that isolation can never constitute rehabilitation. No doubt, when a person is out of control, terribly upset, and could conceivably be a danger to himself or to someone else, he may have to be separated from others for a short while in order to calm down. . . . If isolation is continued beyond a short time, the person isolated may begin to experience sensory deprivation, withdrawal, or perhaps psychotic or autistic behaviour."

Dr. George Lynn Hardman, Staff Psychiatrist, Roxbury Court Clinic, Boston; consultant to the Massachusetts Department of Youth Services:

"It is my professional opinion that confining a child in isolation for punishment serves no treatment purpose whatsoever. On the contrary, because the child's problem or problems are in no way being dealt with during the period in which he is confined in isolation, the child's behavior deteriorates rather than improves in the course of his isolation. The isolation of a child only inhibits that child's emotional development. . . ."

"It is my professional opinion that even a child who is acting out violently should not be isolated. . . . When a violent child is locked in a sparsely furnished room and left alone, he feels panic which may cause him to persist in his violent outbursts which may in turn cause staff to justify his continued isolation. . . ."

"It is my professional opinion that no human being, adult or child, should ever under any circumstances be confined in the barren, dark cell known as a 'bug-out' room which I observed in Annex B. Such cells are similar to those used to test experimentally the effects of sensory deprivation; well-adjusted adult volunteers have been found to hallucinate in such an environment within a matter of hours."

See also Lollis v. New York State Department of Social Services, 322 F.Supp. 473 (S.D.N.Y.1970). I hold that isolation of children under the circumstances as described in my findings of fact for

the solitary confinement rooms of Annex B to be cruel and unusual punishment, and enjoin any use of these confinement cells.

▆ Further this Court holds that because the conditions of confinement in Annex B are anti-rehabilitative, use of Annex B is enjoined as a violation of equal protection and due process of law. If a boy were confined indoors by his parents, given no education or exercise and allowed no visitors, and his medical needs were ignored, it is likely that the state would intervene and remove the child for his own protection. See R.I.G.L. § 14–1–34. Certainly, then, the state acting in its *parens patriae* capacity cannot treat the boy in the same manner and justify having deprived him of his liberty. Children are not chattels.

*Maximum Security—ACI*

Plaintiffs attack confinement of juveniles at the ACI on two theories—that the administrative transfer procedures do not meet the requirements of due process and equal protection and that, regardless of the procedures used, confinement of juveniles with adults at a penal institution is constitutionally impermissible.

It appears that the original decision to transfer a boy to Maximum Security is made by defendant Devine and is subject to the approval of defendant Affleck. No rules have been promulgated defining the circumstances under which such a transfer would be deemed warranted, nor are there any other forms of institutionalized controls on defendants' discretion. The constitutionality of these transfer procedures was upheld by the Rhode Island Supreme Court in Long v. Langlois, 93 R.I. 23, 170 A.2d 618 (1961). *Long* appears to be decided on the theory that juveniles confined to the Training School have no claim to constitutional rights, 170 A.2d at 619,

and so has been overruled by In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L. Ed.2d 527 (1967).

In Shone v. State of Maine, 406 F.2d 844 (1st Cir. 1969), the First Circuit Court of Appeals held that transfer of a juvenile from the Maine Boy's Training Center to the Men's Correctional Center, on an administrative finding of incorrigibility without benefit of those procedural safeguards that were afforded juveniles committed directly to the Men's Center, was a violation of due process and equal protection of the laws. The holding turned upon findings that the Correctional Center was functionally distinct from the Training Center and that the fact that controlled the juvenile's transfer was no part of the original adjudication as to whether he was a juvenile offender. *Shone* relied upon the reasoning of Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) and of Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

From the testimony of Bernard Humes and James Young it is evident that boys are transferred to Maximum Security for their behavior after they are committed to the Training School, behavior such as running away, and that the transfers are accomplished without notice or hearing.

The Boys' Training School and the ACI Maximum Security appear to be functionally distinct both in fact and in law.

The criminal courts of Rhode Island may commit a minor to the ACI upon conviction of a criminal offense. R.I.G. L. § 12–19–6.

▆ Under *Shone*, it appears that the practices employed by defendants in transferring juveniles to the ACI pursuant to their authority under R.I.G.L. § 13–4–12 are violative of due process and equal protection.[3]

3. The plaintiff in *Shone* had been adjudicated a juvenile delinquent and had been transferred from the Training School to the Men's Correctional Center on a find-

ing of "incorrigibility." The *Shone* court was not faced with the situation of a boy confined to a Training School for truancy, or some other non-criminal reason, who is

██ There is a substantial question whether a boy who has not been afforded the full protections of the criminal adjudicatory process may be confined to the ACI at all. Apparently this argument was not presented to the *Shone* court. As the court in State ex rel. Londerholm v. Owens, 197 Kan. 212, 416 P. 2d 259, 269 (1966) so succinctly stated:

"The validity of the whole juvenile system is dependent upon its adherence to its protective, rather than its penal, aspects. Dispensing with formal constitutional safeguards can be justified only so long as the proceedings are not, in any sense, criminal.

We hold confinement in a penal institution will convert the proceedings from juvenile to criminal and require the observance of constitutional safeguards. The non-criminal aspect is the legal backbone of the constitutionality of all American juvenile court legislation. If after a juvenile proceeding, the juvenile can be committed to a place of penal servitude, the entire claim of *parens patriae* becomes a hypocritical mockery."

For similar holdings, see also Baker v. Hamilton, 345 F.Supp. 345 (W.D.Ky. 1972); United States ex rel. Stinnett v. Hegstrom, 178 F.Supp. 17 (D.Conn. 1959); White v. Reid, 125 F.Supp. 647 (D.D.C.1954); Boone v. Danforth, 463 S.W.2d 825 (Mo.1971); In re Rich, 125 Vt. 373, 216 A.2d 266 (1966); State ex rel. McGilton v. Adams, 143 W.Va. 325, 102 S.E.2d 145.

This Court is greatly disturbed by the testimony of two plaintiffs who have been confined to the ACI that they learned little there other than how to better commit crimes, that they were threatened with homosexual attacks, and that they had not participated in any rehabilitative programs.[4] Such a situation surely cannot be in society's best interest. I note that a report by a committee appointed by the Governor of Rhode Island strongly recommended that the practice of incarcerating juveniles at the ACI be stopped.

The Court recognizes that some of these juveniles may be detrimental to the atmosphere of the Training School and are better confined elsewhere. Confinement with adult felons in a prison is not the only alternative open to defendants for dealing with these boys. I draw upon the wisdom of United States ex rel. Stinnett v. Hegstrom, 178 F. Supp. 17, 20:

"The letter of the Attorney General quoted in the report points out the difficulty of controlling dangerous and hardened young criminals at the National Training School. The records in the cases of the petitioners now before this court indicate that they are serious disciplinary problems. It is probable that they need stricter custody and supervision than the general population of the Training School. This must be provided, however, outside the general penal population, or the purposes of the juvenile acts will be defeated and the cogent reasons which have led the courts to sanction custody of juveniles without full criminal proceedings will become hollow pretense."

Adult Correctional Institution.

*Annex C and Annex C Cellblock*

It appears that Annex C is used primarily for two purposes; that is, to punish juveniles who have caused discipline problems and to detain juveniles who have run away in a somewhat more

Plaintiffs' motion for preliminary injunction is granted. Defendants are enjoined from transferring or confining any member of the plaintiff class in the

---

then transferred to an adult institution for behaviour which is also not criminal. In such a situation I have considerable doubt whether a judicial hearing could cure the unconstitutionality of the transfer.

4. I note the concern shown by Judge Gessell in United States v. Alsbrook, 336 F.Supp. 973, 977–978 (D.D.C.1971) over the intermingling of less sophisticated juveniles with those more hardened.

escape proof facility. According to defendants, the primary mission of Annex C is security from escape. Annex C cellblock serves the same purposes.

The class of inmates at the BTS consists of several subclasses according to the reasons for their confinement. There are boys there (1) who have been voluntarily committed by their parents; (2) who have been adjudicated dependent or neglected by their parents; (3) who have been convicted of delinquency; that is, who have committed an offense which, if committed by an adult, would be a felony, or otherwise more than once violated a law; (4) who have been adjudicated wayward, that is, deserted home without good cause, or habitually associated with dissolute, etc. persons, or leading an immoral or vicious life, or habitually disobedient, or truant, or violated a law; and (5) those awaiting trial. For all of these subclasses the legislature has decreed rehabilitative non-penal treatment.

The question is to what extent confinement in Annex C and in its cellblock can be justified as necessary to the ends of rehabilitation. The connection between this confinement and rehabilitation may be thought to exist through several links. First, as defendants have argued, they have to have the boys to treat them, that is, they cannot treat a boy who is run away. So they seek to justify this confinement as both actually necessary to stop yet another run away attempt and as a psychological deterrent to future attempts. They also argue their responsibility is to keep these boys out of the outside community until they have been reformed and are ready to return. Another link is the need to segregate boys, both to remove them as an obstacle to the rehabilitation of others, and to reform them. Presumably, segregated juveniles are themselves helped to reform by segregation by removing them from situations with which they cannot cope and by depriving them of "privileges" which they then presumably have incentive to earn back. There is also some evidence that on at least one occasion segregation has been necessary due to racial tensions. Defendants assert that Annex C and its cellblock are the only facilities they have in which they can segregate juveniles or keep them from running away.

Whatever the reasons, confinement in Annex C and its cellblock is punishment. The conditions of confinement are themselves detrimental to rehabilitation. It is conceivable perhaps, that this would not be so for security confinement in some other facility, but, as defendants assert, all they have is Annex C. Yet it is also clear that the conditions of confinement in Annex C and the cellblock are not the least restrictive means available to defendants for achieving their purposes of segregation and preventive detention, assuming arguendo these are permissible purposes.

 Specifically, as to Annex C, I find no reason to deprive inmates of outdoors exercise. A well fenced exercise yard is available and is part of the institution. It should be used to provide a minimum of three hours of outdoors exercise daily, weather permitting. Defendants must provide daily outdoors exercise for all inmates of the BTS. I would note that this relief is in accord with testimony that the Assistant Director of the Department of Social and Rehabilitative Services wanted the inmates to have outdoors exercise.

As to education, there is a bitterly cruel irony in removing a boy from his parents because he is truant from school and then confining him to a small room, without exercise, where he gets no education because he already knows how to work the few math problems which constitute education at Annex C. Boys confined to Annex C are entitled to the same education received by inmates at the Training School proper. Whether equal educational opportunity is a fundamental right triggering strict judicial review, see Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241, 1255 (1971) or not, I find that denying education to inmates of Annex C which they would obtain in the BTS proper does

not serve any permissible interest. Defendants are enjoined from confining any members of the plaintiff class at Annex C without providing them education which is the equivalent in duration, subject matters, materials, and otherwise, with that provided in the BTS proper (excluding Cottage B). Inmates confined to the B Cottages are also to be provided equivalent education. As to plaintiffs' prayer that all inmates at the BTS be provided with a full day of school which meets the Standards for Approval of Secondary Schools promulgated by the Rhode Island Department of Education, the motion for preliminary injunction is denied. The BTS may or may not offer adequate substitutes for a full day of schooling. The record is bare.

This Court sees no reason for feeding boys on a schedule which will insure their hunger. So long as defendants adhere to the present feeding schedule, and/or serve dinner to inmates before 6 p. m., they are enjoined from confining inmates in Annex C without allowing them daily canteen rights and the right to keep food in their rooms.

 Even with these changes in conditions at Annex C, confinement there will be worse than confinement in the cottages. Plaintiffs accordingly ask that all boys who were transferred to Annex C without a judicial hearing be sent back to the cottages and further seek to enjoin defendants from transferring any juvenile to Annex C and confining any juvenile to the Annex C cellblock. These motions are denied. The Court finds itself in need of considerably more expert testimony before it attempts to rule on these questions. The Court invites both sides to present expert evidence at the hearing on the merits. Considerable harm might result to the community were this Court to summarily deny defendants' use of Annex C.

Although these motions for preliminary injunction are denied, the Court would like to make some seminal observations. As to the transfer procedures, the loss of liberty entailed by a boy in a transfer to Annex C or the cellblock may well require that such transfers be done in accordance with due process of law. Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Cluchette v. Procunier, 328 F. Supp. 767 (N.D.Cal.1971).

 It may also be that transfer to Annex C, if eventually found to be permissible at all, may well be limited to one or possibly two of the subclasses at the BTS, those adjudicated delinquent and those awaiting trial for delinquency. Assuming that no rehabilitative justification may be found for Annex C,[5] then

---

5. Affidavits from plaintiffs' two experts are vehement in their condemnation of use of Annex C and its cellblock. Dr. Jerome Miller stated:

"It is my firm belief that these two facilities, Annex C and the isolation cells above Annex C, should not be used under any imaginable circumstances to house juveniles. In light of the fact that there is not enough possibility for programs to be developed in either of these two cell blocks, and that the juveniles will remain in their rooms for most of each day, I believe that one who comes out of Annex C or Annex C lock-up will be less able to cope with the real world, than when he entered either of those two units. Most likely, the juvenile will unlearn whatever social skills he might have possessed or relearn others which involve survival in that kind of a circumstance i. e. survival of being alone, survival without sensory stimulation. In addition, children incarcerated in either of these two settings will fall behind educationally and vocationally. Most important, however, the juveniles will fall behind in their social inter-action skills. Everything that I saw in Annex C, and in Annex C lock-up led me to believe that the programming in those two units will not help rehabilitate the youths incarcerated in them, but will most likely heighten their chances to return one day to a penal institution. I make this statement simply because incarcerating juveniles in that type of surrounding, can only have destructive results. The most likely resulting detrimental effect will be that the youth will further continue to develop his own self-image as 'the criminal.'

Specifically as to the upstairs lock-up in Annex C, I would never use them

Annex C may only be justified in terms of society's need to be protected. It would be foolish to ignore the reality that society may have been harmed by a delinquent's offenses and should be protected against them. The same may be true for a juvenile awaiting trial for delinquency. But I take it that the presumption of innocence attaches to juveniles awaiting trial. See In re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L. Ed.2d 368 (1970). It may be that the only permissible purpose for confining these awaiting trial juveniles is "to make certain that those detained are present when their cases are finally called for trial." Hamilton v. Love, 328 F.Supp. 1182, 1191 (E.D.Ark.1971). See also Constitutional Limitations on the Conditions of Pretrial Detention, 79 Yale L.J. 941, 955 (1970).

As to the other subclasses of inmates, society needs very little or no protection against them. "Wayward" children have not violated any criminal laws, except perhaps misdemeanor offenses, see R.I.G.L. § 14–1–3. I doubt whether the legislature could pass laws to imprison a boy for truancy; yet for exactly this reason boys have been confined to the BTS and eventually to Annex C. As the Supreme Court has said, "[D]ue process requires that the nature and duration of commitment bear some reasonable relationship to the purpose for which the individual is committed." McNeil v. Director, Patuxent Institution, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972). The same must be said for boys voluntarily committed by their parents.

■■■ Children who are committed to the BTS because they are dependent or have been neglected by their parents are confined on what must be a pure *parens patriae* theory. They are at the BTS because of their parents' actions, not their own. To cause them to suffer dep-

---

under any circumstances. The results of using such medieval facilities will be at best to produce little criminals or at worst to produce very sick youngsters."

Dr. Hardman's affidavit concurs:

"7. I have been told that boys confined in Annex C are locked in their rooms for as much as 20 hours a day, that they are never permitted outdoors for exercise, that the only indoor exercise they receive on a regular basis is calisthenics, that the only education available to them is one hour of math and history studies daily, that the only indoor recreation available to them is television, card games, or ping pong, and that they receive virtually no attention from any professionally trained personnel. Assuming that these facts are true, it is my professional opinion that confinement under these circumstances serves no treatment purpose whatsoever, severely inhibits any further emotional development of the boys, and predisposes these boys to regard themselves as prisoners, as 'cons.' When a boy leaves an institution with an image of himself as a 'con,' chances are great that he will become an adult 'con.'

8. Boys confined in Annex C under the circumstances enumerated in paragraph 7 above will in my professional opinion become progressively more emotionally stunted. Boys in their teens are at a developmental stage when they are in great flux. They are at a period in their life when their behavior can be changed with proper attention to their emotional needs. I am familiar with the principles of behavioral conditioning and with the principle of differential reinforcement, but I know of no sound psychiatric principle or theory which condones a system which deprives boys in need of help of those things which are indisputably beneficial to them such as fresh air, large muscle exercise, and a full day of academic or vocational training. If behavior is to be shaped by a system of increasing privileges, it is my professional opinion that proper psychiatric treatment dictates that only those pleasurable things which are not necessary to a boy's growth such as television, cigarettes, movies, card games and ping pong be treated as privileges to be earned.

9. It is my professional opinion that confinement of boys in the cellblock which I observed on the second floor above Annex C can serve no treatment purpose whatsoever and in addition will have a detrimental impact upon any boy confined there. It is my professional opinion that there is no justification for ever placing a child in this cellblock."

rivations under law because of their status is constitutionally forbidden. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); see also Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

If boys from any subclass at the BTS commit offenses under the criminal laws while at the BTS, they may be charged with delinquency and given a judicial hearing.

These are merely preliminary observations, as is the following:

> "But traditional legal standards of precisely equal justice are not always compatible with the social welfare precept of aid according to need. Offender rehabilitation is purportedly the primary aim of the juvenile system; to accomplish this goal, each youth must be treated according to his particular needs. A purely legal solution—based on equal justice under law—would nullify the rehabilitative nature of the juvenile process by either imposing social sanctions upon one who does . not require them, or withholding treatment from one who needs it. Thus, one must be wary, lest *Kent, Gault,* and their progeny, which seek to impose upon the juvenile process the legal standards of criminal justice, be misdirected to deprive the juvenile system of its opportunity to devise social controls which do not merely 'fit the crime,' but which are responsive to individual needs."

Kittrie, Can the Right to Treatment Remedy the Ills of the Juvenile Process, 57 Geo.L.J. 848, 860 (1969)

The Court repeats that it invites both sides to present testimony from experts in this field.

*Solitary Confinement*

■ Plaintiffs ask for an injunction restraining the isolation of a juvenile in a room for more than two hours unless a psychiatrist certifies in writing to the Court and counsel for the plaintiffs that the juvenile, if released, would be either a danger to himself or a danger to the others in the institution, but in no case may a juvenile be isolated in a room for more than 24 hours within a seven day period.

Plaintiffs have introduced some expert testimony by affidavit, arguing that isolation is contrary to rehabilitation. They argue that the effects of isolation on a juvenile are far worse than on an adult. To quote from an expert affidavit submitted in Lollis v. New York State Department of Social Services, *supra*:

> "Isolation as a 'treatment' is punitive, destructive, defeats the purposes of any kind of rehabilitation efforts and harkens back to medieval times. There is no justification for such treatment unless one wants to dehumanize a young person in trouble and wants to create more trouble with such a person in the future."

Plaintiffs have demonstrated probability of success in showing that plaintiff juveniles have a claim to rehabilitative treatment. See Wyatt v. Stickney, 325 F.Supp. 781 (M.D.Ala.1971). This Court is convinced that solitary confinement may be psychologically damaging, anti-rehabilitative, and, at times inhumane.

However, the Court does not feel that there is sufficient expert testimony on the record of what constitutes solitary confinement as opposed to segregation and at what point it becomes destructive. In the absence of such evidence the Court finds it impossible to frame an equitable order and so denies the motion for preliminary injunction. From the record, however, it appears that solitary confinement is used as a solution to problems caused by juveniles at the BTS. The Court would urge defendants to find individualized methods of treatment for problem boys before final hearing on this matter.

*Minimal Conditions of Confinement*

■ Plaintiffs seek an injunction prohibiting confinement of juveniles in

any facility without providing them the following:

a) A room equipped with lighting sufficient for an inmate to read by until 10:00 p. m.;

b) sufficient clothing to meet seasonal needs;

c) bedding, including blankets, sheets, pillows, pillow cases and mattresses; such bedding must be changed once a week;

d) personal hygiene supplies, including soap, toothpaste, towels, toilet paper, and a toothbrush;

e) a change of undergarments and socks every day;

f) minimum writing materials; pen, pencil, paper and envelopes;

g) prescription eyeglasses, if needed;

h) equal access to all books, periodicals and other reading materials located in the Training School;

i) daily showers;

j) daily access to medical facilities, including the provision of a 24-hour nursing service;

k) general correspondence privileges.

Although these minimal requirements may be provided in the cottages at the Training School, the record indicates that these have not been made available at all times in all facilities of the BTS. These are substantially the same as the regulations for minimal conditions of confinement of adult inmates at the ACI, which were promulgated by the State following this Court's order in Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970), final consent decree entered April 20, 1972.

The state has offered no reason to justify this discrimination against juveniles. The Court is hard pressed to think of any reason to justify this discrimination which would serve the purpose of rehabilitation. While defendants' carrot-and-stick program at the BTS which uses loss of privileges and gain of privileges to spur socially acceptable behaviour from the juveniles might be thought to justify this, there are floors on the power of defendant administrators to deprive inmates of "privileges." It is clear that the state does not consider these minimal conditions of confinement to be "privileges" for adults, nor does this Court consider them to be "privileges" for juveniles. Society has bargained with these juveniles and it should be an honest bargain. They have been confined through a process offering them fewer protections than adults have; they may not now be treated worse than the adult inmates are. Defendants are ordered to provide these minimum conditions of confinement.

*Plan for Further Rehabilitative Treatment*

Plaintiffs move that defendants be required to submit a plan to this Court within thirty days:

"(A) Whereby appropriate and adequate treatment will be provided to the inmates of the Youth Correctional Center and said plan shall include provision for removing all juveniles from the Minimum-Medium Security Building of the Adult Correctional Institution to an appropriate alternative facility. Implementation of this plan is to occur within 90 days of the Court's ruling on this motion;

(B) Whereby appropriate and adequate vocational training will be made available to all inmates at the Training School;

(C) Whereby an appropriate and adequate drug rehabilitation program will be made available to all inmates of the Training School;

(D) Whereby an appropriate and adequate individual psychiatric counseling program will be made available to those inmates which from a medical standpoint shall benefit from such treatment as determined by a proper psychiatric examination of each inmate of the Training School."

The various aspects of the proposed plan will be discussed separately.

*Closing Annex C* (Part A)

Part (A) of plaintiffs' motion is denied as premature. As indicated, the Court feels itself in need of further expert testimony on the issue of Annex C.

*Drug Rehabilitation Programs* (Part C)

■ While there is some deposition evidence of drug problems at the BTS, the record is virtually barren of the extent of the problem and of defendants' efforts to meet the problem. Plaintiffs have not demonstrated irreparable injury and so this request for injunctive relief is denied. Cf. Addicts Rights Org. v. Hendrick, No. 2941, Pa.C.P., (Nov. 12, 1971).

*Vocational Training Program* (Part B)

■ There are no vocational training programs at any of the facilities of the BTS. By affidavit of Dr. John Finger, plaintiffs argue that vocational training is necessary to rehabilitate these boys. Defendants have submitted affidavits heatedly denying this and defending their present program.

This Court is not inclined to interfere with the running of the Training School on such a scanty record and in the absence of a clear showing of deprivation of a constitutional right. It may be that members of the plaintiff class have a claim to positive rehabilitative treatment in the form of vocational training, but there is insufficient showing that vocational training is a necessary part of a rehabilitation plan. The Court would welcome testimony from experts for both sides on this issue at hearing on permanent relief.

*Psychiatric Counseling Program* (Part D)

■ There is no regular psychiatric or psychological counseling program at the Training School, nor is there a psychiatrist or clinical psychologist on the BTS staff. A type of group therapy program has been instituted in the cottages of the BTS proper, but not in Annex C.

Defendants have argued to this Court that the measure of the BTS is not to be judged by its physical plant but by the number of adequately trained personnel available to the boys. On such a theory the lack of regular psychiatric care for the inmates is even less defensible. The Court does not wish to suggest that "delinquency" is a disease or medical condition. See Szasz, The Right to Health, 57 Geo.L.J. 734 (1969). Such a suggestion would open a Pandora's box. See Note, Conditioning and Other Technologies Used to "Treat?" "Rehabilitate?" "Demolish?" Prisoners and Mental Patients, 45 So.Cal.L.Rev. 616 (1972). But it is manifest that denial of psychiatric care to some of the inmates is to ignore their needs and may hasten a process of deterioration. Plaintiffs' motion is granted and defendants are ordered to submit an appropriate plan within thirty days.

*Conclusion*

In closing, the Court emphasizes that this judgment does not reflect on defendants' choice of theory of rehabilitative techniques being employed in cottages at the Training School proper. The Court realizes that defendants have been handicapped by lack of adequate facilities and trained personnel to deal with the plaintiff class, and that the remedy for this situation will involve the expenditure of state funds. See United States v. Alsbrook, D.C., 336 F. Supp. 973, 980 n. 15. The issue is not the good faith or bad faith of defendants, but rather the issue is of the protection of the constitutional rights of these boys. As the First Circuit Court of Appeals has said:

> "Nor can it be any excuse for continuous, as distinguished from temporary accidental, inhumane treatment . . . that the representatives of the state were doing the best they could."

Rozecki v. Gaughan, 459 F.2d 6 (1st Cir. 1972)

Plaintiffs will prepare an order reflecting the rulings of this opinion.