L STEVEN R. PLOTKIN, Judge.
The issue in this appeal is whether the juvenile judge was correct in determining that the conditions of S.D.’s[1] confinement at the juvenile facility were unconstitutional.
On September 21, 2000, S.D. pled guilty to possession of a controlled substance, unauthorized use of a moveable, resisting an officer and reckless operation of a motor vehicle. The court sentenced S.D. to one year for possession of crack cocaine, one year for unauthorized use of a movable, and six months each for resisting an officer and reckless operation of a vehicle. These sentences were to be run consecutively, with S.D. getting credit for time served.
The DOC initially placed S.D. at the Jetson Correctional Center for Youth and later moved him to its facility in Tallulah, LA. On May 18, 2001, while on his way to class, S.D. became involved in an altercation with the correctional guard. As a result he received a fractured jaw. For the facts and reasons described in the excellent reasons for judgment issued by the trial court, which is attached to this opinion, we accept his opinion in toto.
[ Conclusion
The trial court did not err in finding that S.D.’s conditions of confinement were unconstitutional.
For the foregoing reasons stated the judgment of the trial court is affirmed.
AFFIRMED.
j ATTACHMENT
STATE OF LOUISIANA
ORLEANS PARISH JUVENILE COURT
IN THE INTEREST OF S.D.
No. 00-147-04-QF
Dec. 17, 2001
JUDGMENT ON YOUTH’S MOTIONS TO MODIFY DISPOSITION
December 17, 2001

Youth’s Background

S.D. is a young man now seventeen years old. His life has been a story of violence, physical & sexual abuse, drugs, *416 and jail. His mother is dead — murdered by his father who forced him to watch as he stabbed her twenty-one times with a kitchen knife. Her death ended a nightmare of domestic violence that terrorized his infancy and toddler years. He has had no contact with his father, now serving a twenty-six year sentence at Angola, since that day.
He found a new life and a new home with a paternal uncle. A pedophile, the uncle sexually molested him. S.D. moved in with a maternal great-aunt who had been appointed his legal guardian. She regularly beat him with an electrical extension cord. He started running away. She began putting him in mental hospitals. Between his sixth and tenth birthdays, he entered the New Orleans Adolescent Hospital — a mental health facility — five times and was put on medication for depression. He began using street drugs when he was eleven.
When he was thirteen, three girls said he pointed a BB gun at them and threatened to shoot. Police arrested him for aggravated assault. A different great-aunt then stepped forward and took him in as he served his probation. That was January 1998.
By August that year, with a simple robbery conviction and his probation revoked, the Department of Corrections (DOC) placed him first at the Reynolds Institute, a lock-down residential group home for youth, and then at the Bridge City Correctional Center for Youth, the juvenile equivalent of jail. Things did not go well. At a March 1999 hearing, DOC reported he had incurred 448 rule violations and been involved in “104 additional incidents.” 98-176-02-Q-E, 3/25/99. In September 1999 he returned to his great-aunt’s home after serving his full time.
1 ¡,2000 did not mark an improvement in his fortune. He had a place to stay but that was it; for anything else he was on his own. He tried selling drugs to support himself and got arrested for possession of cocaine with intent to distribute. A few months later police picked him up for possession of a stolen car, reckless operation of a vehicle and resisting arrest. The D.A. accepted the charges and S.D.’s consolidated cases were allotted to this section of Juvenile Court for trial

Procedural History

On September 21, 2000, represented by the public defender, S.D. stood up and admitted the allegations in matter number 00-147-04-QF that he violated R.S. 40:967(0(2), possession of a controlled dangerous substance (to wit, one piece of crack cocaine), and in matter number 00-172-05-QF, violations of R.S. 14:68.4, unauthorized use of a moveable, R.S. 14:108.1, resisting an officer, and R.S. 14:99, reckless operation of a motor vehicle. After questioning the youth under oath regarding his Boykin rights, the Court accepted the pleas as being knowingly and voluntarily made, and having a basis in fact.
After a review of S.D.’s extensive record, and upon the recommendation of the probation department and mental health evaluations, the Court found the youth to be a proper person for commitment to the custody of the Louisiana Department of Public Safety & Corrections (hereinafter DOC), and committed him to its custody for a period of one (1) year for possession of crack cocaine, one (1) year for the unauthorized use of a moveable, and six months each for resisting an officer and reckless operation of a vehicle. The Court ordered that these sentences were to run consecutive to one another, for a total commitment time of three (3) years in the Department’s custody.
*417 Further, the Court ordered additional psychiatric & psychological testing of the youth, and ordered that DOC make a referral on the youth’s behalf for counseling relative to grief, anger management and being a victim of sexual abuse. The Court remanded the youth on that date, granting him credit for time served.
The DOC placed the youth at the Jetson Correctional Center for Youth in Baton Rouge and in January 2001 moved him to its correctional facility at Tallulah, Louisiana, known as the Swanson Correctional Center for Youth — Madison. In early February 2001, DOC ' forwarded an | ¡¡assessment and evaluation of S.D., performed by the department’s Juvenile Reception & Diagnostic Center at Jetson.
Given S.D.’s history — both personal and legal — this Court, on its own motion and pursuant to Louisiana Code of Evidence Art. 706, appointed Cecile C. Guin, Ph.D., LCSW (Licensed Certified Social Worker), Director of the Office of Social Service Research & Development, LSU School of Social Work, to serve as a Special Expert, to evaluate the youth
taking into consideration, but without limitation thereto, the condition, supervision, treatment, and rehabilitation program for the juvenile, to prepare a written report on her findings, with recommendations, if any she had, as to the appropriateness of the placement and treatment plan in meeting the individual social and mental health needs of the juvenile, the prognosis for the youth’s rehabilitation, and the need or not for mental health treatment, including, if recommended, what that treatment would entail. Order of April 3, 2001.
Following her evaluation of the youth, Dr. Guin testified on May 3, 2001, regarding her findings and recommendations. Pursuant to her findings, the youth filed a Motion to Modify the Disposition and later additional motions that included allegations that since the May 2001 hearing, the youth had suffered a broken jaw at the hands of guards at the Tallulah facility. The DOC denied the allegations of abuse by its personnel and conducted an investigation.
The Court heard testimony regarding the consolidated motions from 19 witnesses over the course of four separate days: August 6, September 5, 10, & 24* 2001. At the conclusion of the testimony, the youth supplemented his consolidated motions to modify the disposition with a motion asking the Court to find the conditions of confinement in which he was placed at the Tallulah facility to be unconstitutional.
The Court denied the youth’s motion to modify as it related to his request for an early release, pending further evaluations, the results of a home study on one of the youth’s aunts residing in California through the California Department of Social Services, and.a recommendation, after a review of this material, as to appropriate placement by Dr. Guin. On the conditions of confinement issue, the Court requested briefs from the youth and DOC and took the matter under advisement upon receipt of same. ' Á further hearing is set for December 17, 2001 to receive the results of the California Home Study.

\ ¿Youth’s Allegations of Abuse

S.D. testified that he sees fights at Tal-lulah every day. Yol. 1, p. 9, In. 28.[1] He *418 stated he had been in a gang fight as recently as July 2001. He readily admits he has been in numerous fights, for which sometimes he received a disciplinary ticket and other times he did not. The youth explained this phenomenon, stating sometimes the staff just says, “handle your business.” V.l, p. 10, In. 20.
The youth’s allegations are serious, but not complicated. S.D. testified that on May 18, 2001, he was going from the “Kentucky” dorm to his classroom. On the schoolhouse steps, he encountered Cadet Mitchell, a female guard, near her post in front of the door. According to S.D., he told Mitchell he was “on detail” that day, meaning that he was exempt from attending school. V.l, p.17, In. 21-26. He was just kidding her, he said, for in fact, he was not “on detail” at all that day.
S.D. believes that Lieutenant Colonel. M.[2], who was present at the time, overheard S.D.’s statement to Mitchell, and claims Lt. Col. M. then told him to get his “f — ’ ass in class.” At that point, S.D. recalled that Lt. Col. M. and another youth “got into it” — -meaning into some form of argument. V.l, p. 18, In. 8-9. S.D. then made another improvident remark by telling Lt. Col. M. “why didn’t you tell that to the guy you got into it with this morning.” V. 1, p. 18, In. 9-10.
Lt. Col. M. again ordered S.D. into the building and to class. As he entered the building, S.D. saw another officer, Lt. W., who called out to him to go see “what the Colonel” wanted. V. 1, p. 18, In. 25-29. The youth complied. It was then, according to S.D., that Lt. Col. M. grabbed him by the shirt and walked the youth into the building. Outside the second classroom, S.D. says Lt. Col. M. “wrapped his arm around my neck and went to choking me. I was getting light headed and starting to get dizzy.” V.l, p. 19, In. 5-17. Lt. Col. M. is said to have grabbed S.D. from behind.
The youth then reached back to grab at Lt. Col. M.’s neck, as Lt. W. was standing there, watching the two struggle. Lt. W. told S.D. to let go of the colonel. S.D. said he was about to fall because he was getting light headed and refused to let go of Lt. Col. M. until the colonel let go of him. Lt. W. repeated the order to let go of the colonel. Again S.D. would not comply, still being held around the neck by Lt. Col. M.
| sIt was then, according to S.D., that Lt. W. “snuck him”[3] and struck the youth in the jaw. V.l, p. 20, In. 1-2. S.D. fell to the ground and tried to move his jaw. V.l, p. 20, In. 29-30. He stood up and noticed his jaw was getting stiff. His mouth was bleeding as well.
S.D. says after that the two officers then brought him outside the school building. They approached Cadet Mitchell and told her to escort S.D. to the infirmary. V.l, p. 21, ln.8-10. Mitchell, Lt. Col. M. & Lt. W. walked out to the mess hall area. At that point, Lt. Col. M. told Mitchell that he would take S.D. to the infirmary himself.
The young man with whom S.D. says Lt. Col. M. had “gotten into it with” earlier in the morning was present behind the mess hall. V. 1, p. 22, In. 2-8. Lt. Col. M. informed this youth that he was going to show “this (referring to S.D.) mother f. ass” something. Lt. Col. M. then got on the radio and called other sergeants to the scene. S.D. says that at this point Lt. Col. *419 M. and the other officers began to “hack up” — punching a youth in the mouth,throwing him to the ground, putting his hands behind his back and “all kinds of stuff.” Y. 1, p. 22, In. 9-12. After this scene, Lt. Col. M. gave S.D. back to Mitchell to be brought to the infirmary.
And so she did. At the infirmary, S.D. told the nurse that he hurt his jaw when he “ran into a pole.” V. 1, p. 22, ln.14-15. In court, S.D. explained that he told her that “because they (Lt. Col. M. & Lt. W.) were going to press charges on me.” V.l, p. 22, ln.18. S.D. is familiar with other youth who are presently doing additional time at Tallulah as a result of DOC pressing charges against them for battery, on staff or guards. Further, he interpreted Lt. Col. M.’s show of force on the other youth as a demonstration of power and of what would happen to him if he told the truth, namely, he would experience some form of retaliation.
The infirmary doctor looked at S.D.’s jaw and was skeptical of the “pole” story. Stating that he viewed the doctor as an outsider who was not a part of the DOC system, S.D. told the him that Lt. W. struck him in the jaw and that he had lied about the pole for fear that Lt. Col. M. & Lt. W. would find out and press criminal charges against him, seek revenge, “or something.” V. 1, p. 23, ln.24-29.
| Youth’s Testimony
In its brief, the State rightly points to S.D.’s initial “change of story” in accounting for his injury as a stumbling block to believing his allegations. State Brief, p.l. Testimony showed that upon arriving in the infirmary, S.D. told Nurse Cader he hurt his jaw when he “had hit a pole.” V.3, p. 45, In. 17. She said “I questioned him further as to how he hit the pole. And he said he was horse playing with another offender. And I asked him the offender’s name. At first he didn’t want to give it to me, but then he did. He told me it was Malcolm Jenkins.” V.3, p. 45, In. 18-22.
In its cross-examination of the youth, the State asked S.D. why - he should be believed now, in light of this fabrication. S.D. responded, “the only reason I told them I ran into a pole [was] because they were talking about pressing charges.” V.2, p. 216, In. 8-9.
S.D. wrote out two “Offender Witness Statements” in the days after this incident: the next day, May 19, and the other two days after that, on May 21. The first statement he wrote out while recuperating in the infirmary. Defendant’s Exhibit— 12, p. 36. In that statement, S.D. wrote:
I Offender Sean Davis is writing this offender statement because I had been punch in the mouth by (Lt.W.). He had fractured my jaw but when it first happen I told the nurses that I ran into a pole but the only reason I told them that is because the Lt. & the Cl. told me if I tell what happen they was going to give me assault on staff so I just waited to see if they was going to give me a charge so they didn’t write me know (sic) ticket or nothing so I told the people what really happen. Oh and I call my auntie to (sic) and told her what happen in, she told me to tell the true and that’s what I done. I wish to report this to PZT this is the end of my report.
Thus, his testimony on direct and cross-examination are consistent, and each is consistent with his prior written statements.
Nurse Cader’s testimony puts S.D.’s claim about his fears and motivation for offering the “pole” story in some perspective. The State asked her if S.D. wanted to file an allegation with PZT. She answered that “he did not want to file an *420 allegation, and he declined to call PZT at that time.” V.3, p. 46, In. 16-17. This is confirmed by the paperwork she completed contemporaneously with his refusal to contact PZT.
It is also significant that S.D. did not ask to file a PZT complaint until 1:40 p.m. on May 19 — some 30 hours after the incident and some 7 hours since he re-entered the infirmary upon returning from the hospital that morning. Defendant’s Exhibit— 13, p. 2. This lends credibility to his explanation that he was waiting to see if the two officers would file assault charges against [7him. His present fall term release date is 2004; conviction on new charges could keep him in jail for 6 months to a year or more. That is strong incentive to wait. Apparently, he then felt secure enough from prosecution to file a complaint. The officers never did file charges against him.
Both through its brief and as the PZT investigations, DOC has placed great emphasis on S.D.’s change in story. However, a review of his first “story” shows it to be almost incredible on its face. In his interview with the PZT-2 investigator, Lt. W. voluntarily noted that he “knew that was not the full story.” It is uncontradict-ed that the infirmary’s examining physician was skeptical of the story, and S.D. admits he then told the doctor that Lt. W struck him. V.3, p. 223, In. 19-27.
He also said he expressed his fear of being criminally charged by the officers. Ibid., In. 25-27. The doctor has no independent recollection of seeing the youth other than what is in his notes, which are spare. Significantly, that first day he completely refused to make a complaint to PZT. Further, from the moment he did make the allegations he has not deviated from his claim in any way
S.D. testified that he knows other youth convicted of new charges and so are serving additional time. V.l, p. 22, In. 27-30. Under cross-examination, Warden Guyton confirmed that charges are forwarded for prosecution and that for youth over 17 years old, it is mandatory that any sentence received must be served consecutive to the juvenile time for which he is already incarcerated. V.3, p. 234, In. 2-7. The Court notes that S.D. is over seventeen.
In its brief, the State argues that because of S.D.’s “inability to accurately depict how he sustained an injury to his jaw, it is more probable than not that it is a fallacy when he states that Correctional Officers injured him.” State’s Brief, p. 1. Unlike the state’s credibility questions regarding S.D.’s changing his story, this position is puzzling.
In his statement of May 21 given to the PZT-1 investigator, S.D. explained the sequence of events with Lt. Col.. M. & Lt. W. and he stated how his jaw got broken: Lt. W. punched him in the face while Lt. Col.. M. had him in an arm hold around his neck. Defendant Exhibit — 12, p. 37. That written statement and his testimony in court are consistent, both under direct and cross-examination. The explanation is pretty clear. The Court does not find anything confusing about the youth’s explanation of how the injury occurred. Unless the State’s point is just that he can’t prove his allegation.
IsLastly, the State argues that S.D. had a strong motive to pursue these allegations of abuse, namely that he hoped to obtain an early release from incarceration and to “get paid.” State’s Brief, p. 2. This is a significant contention that requires examination.
Master Sergeant Brenda Sue Daniels, the security guard posted at the infirmary where S.D. was placed upon release from the hospital, testified that “(S.D.) asked to *421 use the phone; and I told him yes.” And when he got off the phone he said, “you know what, I’m going to get paid behind this. And I’m going to go home early on early release.” V.2, p. 4. Ln. 7-10. She noted this in her logbook at the time. Defendant’s Exhibit — 12 p. 108
Under cross-examination, S.D. admitted that he was aware of injured youth who had been released. V.2, p. 216, ln. 16-20. Then this interchange took place between S.D. and the State:
Q: And have you heard of those kids who have gotten, other kids who maybe have gotten hurt, or abused, have gotten money for it?
A: No, ma'am
Q: But, you have heard that the other kids that have gotten out of these facilities have been hurt?
A: Not in that facility.
Q: But, in any facility?
A: Yes, ma'am.
Q: So, could this have prompted you into some direction that maybe you’ll get out early?
A: No, ma'am.
Q: But you have heard that?
A: Yes, ma'am.
V.2, p. 216, ln. 20-30; p. 217, ln. 1-4.
Every incarcerated young person wants, hopes, and yearns to be released from jail. It would have been remarkable if S.D. had not wanted to get out. Here, S.D. stated under cross-examination that he pursued his claim because it is true. Also under cross, he admitted that he is unaware of any youth getting money from a claim of abuse.
These admissions, combined with his continual assertions that he is telling the truth and his very first written statement, where he wrote “oh and I call my auntie to (sic) and told her what happen in she told me to tell the true and that’s what I done,” suggest that the State’s reliance on the youth’s articulated wish to get out of jail and maybe some money, is overplayed. The time and events surrounding the statement are also revealing: it is uncon-tradicted that he wrote this statement immediately upon concluding the phone call Sergeant Daniels allowed him to make. V.2, p. 4, ln. 6-8. The Court notes that DOC is in possession of the phone logs that can ^definitively establish who he called; they did not offer it. There is nothing in the record to suggest that he spoke to anyone but his aunt or that she counseled him tell the truth.
In each of S.D.’s court appearances since he entered a guilt plea, the youth has been forthright: plainly admitting what he has done wrong, and accepting the consequences. The Court is familiar with his demeanor — the deliberate, almost laconic manner in which he responds to questions. The Court found his behavior on the stand in these hearings to be in accord with his manner on previous occasions, when — and the Court considers this significant — he faced nothing but the prospect of a long prison term.
During his testimony in this proceeding, the Court found S.D. to be calm (not relaxed, but calm), quiet, and unruffled by the scrutiny or questions put to him. His testimony was clear and consistent, offered without drama or self-righteous indignation, and is in conformity with the written statements he made over the course of two PZT investigations. His account of events has not grown more elaborate with each telling. He did not evade or talk around questions, nor did his responses seem rehearsed. S.D. made a compelling witness, thus raising the importance of the correctional officers testimony.

*422
Correctional Officers’ Testimony

Both Lt. Col. M. and Lt. W. testified as to the events of May 18, 2001 at Tallulah. The Lt. Colonel has almost eight years of hands-on experience in juvenile correctional work. He started at Tallulah when that facility first opened in 1994 under the administration of Trans-American Development Associates, a privately owned company operating the place by contract. During the ensuing five years events and conditions lead DOC to take the unprecedented action of declaring a state of emergency and assuming control of daily operations at the facility on three separate occasions, the final time coming in September 1999.
The state-takeover marked the end of the DOC’s experiment with a privately run juvenile prison at the Tallulah' site. Lt. Col. M. survived the firing and resignation of scores of Tallulah employees of this period to rise to the rank of Lt. Col. within the facility’s hierarchy. He is now the fourth ranking officer at Tallulah.
Lt. Col. M. testified that during the week in question, there had already been several fights between youth around the school area and two had broken out on the morning of May 18-Jjj Before 8:00 a.m. that day, he was supervising the movement of three “units” of youth to their classrooms. He was particularly concerned about getting the kids into class on time that morning due to an “educational audit” going on in the school at the same time that the events alleged by S.D. were occurring. His testimony painted a picture of near chaos and bedlam that morning and apparently, that week. He was alert to further trouble from the youth and the need to maintain or restore order.
Lt. W. has been employed at Tallulah for some time, presently assigned to supervise Unit # 1. His job requires that he make periodic rounds. His morning duties entail escorting the youth to the dining hall, back to the dorm to prepare for “call-out” — the transfer of one unit at a time, depending on the weather — to shepherd them to class. That morning, Lt. W. recalled that he tried to have “Bravo” unit called out last, in order to make sure that the beds were made, the doors locked, etc. During this period, the “Montana” dorm was “running wild” which, according to Lt. W. is a regular occurrence.
On direct examination, both Lt. Col. M. and Lt. W. denied S.D.’s allegations in their entirety. However, the Court has some concerns regarding their testimony.
First, both officers gave testimony that directly contradicted their original Unusual Occurrence Report[4] statements. These are hand written statements by the officers themselves completed within one hour of the incident.
Lt. Col. M.’s complete UOR reads as follows. See Defendant’s Exhibit -12, p. 38.
On May 18 — 2001 I was monitoring school intake when Offender S.D. was running through the hallways. I grab him by the arm, left, and Lt. W. grab the other and held him against the wall. I asked him what was the problem and he stated “nothing.” Lt. W. then replied, “why is your mouth busted?” Cdt. Mitchell then escorted S.D. to the infirmary.
Lt. W.’s complete UOR reads as follows. See Defendant’s Exhibit -12, p. 43.
*423 On 5/18/01 at approximately 8:00 a.m., Offender S.D. was running through the hallway acting out. Lt. Col. M. grabbed the Offender by hi left arm and I, Lt. W., grabbed his right arm, placed him against the wall. Lt. Col. M. asked the Offender what was his problem and he (Offender D.) replied nothing. I then asked him why was he bleeding from the mouth. I then order (sic) Cdt. Mitchell to escort Offender S.D. to Unit II Infirmary.
Lt. W.’s testimony contradicted his UOR in that the UOR described simultaneous actions he and Lt. Col. M. performed together in stopping and holding S.D. Yet, in testimony he stated Inthat by the time he first arrived on the scene, Lt. Col. M. had S.D. up against the wall already with his hands on the youth’s shoulders. Direct Examination: V3, p. 31, In. 13-16; p. 32, In. 11-14; p. 32, In. 27-30 & p. 33, In. 1-2; Cross-Examination: V3. p. 37, In. 16-19 and In. 20-22; Re-Direct Examination: V3, p. 38, In. 15-18.
As both UORs present such a bare bones presentation of facts, it is difficult to understand how he could have been wrong in a report he himself wrote less than thirty minutes after the fact. And yet three months later, on August 21, he could write out a much more detailed version of the incident. Defendant’s Exhibit-12, p. 46. His testimony matches the second, detailed UOR and not the original incident report.
Second, is the issue of Lt. W.’s question “why is your mouth bleeding.” This is a crucial piece of the State’s case. Without the specific information conveyed by this question — that S.D.’s mouth was bleeding — there is nothing to account for why the officers would have taken S.D. to the infirmary. Further, as both men’s UORs contain the statement, the circumstances surrounding it take on even greater significance. With so little information in the original UORs to begin with, any response by S.D. to the question would have been a material fact to include.
Lt. W.’s testimony contradicts the UOR on this point. Further, his testimony is internally inconsistent regarding the matter. Responding to questions by the Court, Lt. W. stated that the youth made no response to the origin of blood question: See V. 3, p. 41, In. 15-25.
The Court: Did he make a response to that question?
Lt. W.: No, sir.
The Court: He didn’t say anything?
Lt. W.: No, sir.
The Court: Just stood there?
Lt. W.: That’s it. All he did was stand there.
Under cross-examination, defendant’s counsel showed Lt. W. the August 2001 transcript of his own statement to the PZT Reinvestigation. See Defendant’s Exhibit -12, p. 14. When the investigator asked him if S.D. ever gave an answer to the blood question, Lt. W. responded “yes, sir. He said he hit a pole, but I knew that was not the full story.” Upon being reminded of this, Lt. W.’s answers became strained: See V.3, p. 42, In. 24-30, p. 43, In. 1-23
Defense Counsel: So, in fact, S.D. did answer?
Lt. W.: When I put him in the class he did not answer me.
The Court: When did you ask the question — why are you bleeding from the mouth?
Lt. W.: When I brought him back out of the classroom to have Cadet Mitchell take him to the Infirmary.
hi/The Court: So did you ask him that question in the hall or when you had him in the classroom?
*424 Lt. W.: I asked him that question in the hall and he didn’t say nothing. So I said well, I know you have blood coming out of your mouth — it was so fast; it went on so fast; I placed him in his class. Once I cleared the hall I brought him out of his class and I asked him again, and he said he hit a pole. Ibid.
This testimony also contradicts the second written statement he gave to the PZT investigator in August; it makes no mention of asking the question twice, let alone any response by S.D. The testimony is inconsistent with his earlier testimony that afternoon. During the time Lt. W. spent on the witness stand, he had recounted the events of this incident seven times. At no time did he mention asking the question more than once, nor that S.D. ever gave him an answer. Only when confronted by defense counsel with the August transcript did he bring out this new information.
It is also strange that the PZT-2 investigator, despite this jarringly new and previously unrelated information, failed to ask any follow-up question nor explored why Lt. W. had not put that information in any of his UORs or shared it with the previous investigator.
Given Lt. W.’s statement that he received training in report writing and had learned to include material facts in a report (V.3, p. 35, ln.19-24), the Court finds it inexplicable that he would have not seen S.D.’s pole answer as important enough to include in his UOR. The omission is especially troubling in that both officers included the question in their report, but nothing about an answer.
Fourth, Lt. W. testified that he placed S.D. in a classroom to wait while Lt. W. cleared the hall of kids supposed to be in class. On cross-examination, he admitted that his UOR made no mention of this action on his part at all. Y.3, p. 37, In. 6-8.
Lastly, Lt. W. testified that all the kids got to class on time during the “educational audit.” V3, p. 38, In. 26-29. Yet, earlier he stated that after Lt. Col. M. left him to “handle” S.D., the hall was crowded, so he had to clear it. He testified that this clearing process “took approximately five, ten, about fifteen minutes at the most.” V3, p. 33, In. 19-23. Given that Lt. W.’s UOR is signed at 8:30 a.m., and he stated that he did “not immediately” [V3, p. 36, ln. 17] write the report until after clearing the hallway, as well as sending S.D. off to the infirmary with Mitchell (Ibid., In 17-19), its seems implausible that all these youth could have gotten to school on schedule for 8:00 o’clock. Their timely arrival to class also contradicts his testimony that it took 113him 5, 10, maybe 15 minutes to clear the hall between the time Lt. Col. M left him with S.D. and when he took S.D. to the infirmary — all of which began happening at or near 8:00 o’clock. See Lt. M’s original UOR.
On direct examination, Lt. Col. M. retold the story how he stopped S.D. in the hall three separate times. First, he stated that saw a maroon T-shirt, a T-Shirt color that he knew should be in class then, “shoot by me,” and I stuck my hand out; stopped him and said “hey man, where are you going, what’s your problem?” V3, p. 6, In. 22-25. Lt. Col. M. identified this youth as S.D. At this point, Lt. Col. M. said S.D. was no longer running, but was walking “real fast.” Ibid., In 25.
A little later, Lt. Col. M. explained that “I stopped him — I stuck my hand out, I probably hit him around his waist to stop him, kind of slow him down, impede him and then when he kind of stop, I grabbed him by his arm, his wrist, kind of pull him to the side.” That’s when Lt. W. came up *425 and asked the youth about the busted mouth. V.3, p. 7, In. 26-29.
Later still, Lt. Col. M. stated, “I grabbed him, I stopped him by the back of the arm, I grabbed him by his wrist. That’s all I did.” V.3, p. 9, In. 25-26.
On re-direct examination, McCall stated: “I saw the color come by me. I stopped him like that with my arm out. I grabbed hold to his arm because he was walking. He didn’t brush up or push away, but I could tell by his body language he was aggravated because I stopped him and then Lt. W. just popped up. And then Lt. W. walked up and grabbed the other arm.” V.3, p. 24, In. 14-20.
According to Lt. Col. M.’s UOR written, signed and dated as 5/18/01 at 9:11 am, it was about 8:00 a.m. when Lt. Col. M. saw S.D. running through the hallway. Lt. Col. M. grabbed S.D.’s left arm, while Lt. W. grabbed the other arm and held him against the wall. Lt. Col. M. asked S.D. what was the problem and S.D. stated “nothing.” According to Lt. Col. M.’s UOR, it was then that Lt.W. “replied ‘why is your mouth busted’?” Defendant’s Exhibit — 12, p. 38.
Lt. Col. M.’s testimony contained inconsistencies and contradicted his original UOR. First, his UOR shows that in response to his question “what’s your problem?” S.D. answered “nothing.” Lt. W.’s UOR gave the exact same one-word answer. Yet in testimony, Lt. Col. M. adds that S.D. answered “what you mean I ain’t got no problem.” V.3, p. 7, In. 3.
InSecond, as a result of S.D.’s answer to his question “what’s your problem,” Lt. Col. M. said “I pointed my eye on him.” V3, p.7, In. 4. Yet, on cross-examination, when defense counsel asked “you didn’t actually see his [S.D.’s] mouth busted,” McCall’s answered with an unequivocal “No.” V3, p. 25, In. 7-10.
Under redirect examination, DOC counsel asked him “if S.D. had a busted mouth in that moment when you were talking to him, would you have noticed it?” Lt. Col. M. answered “I really can’t say yes or no because I was moving.” V3, p. 25, In. 12-17. He continued: “I didn’t have time to really question him. The whole time I was in school couldn’t have been no more than thirty seconds.” Ibid. In 17-19. Interestingly, he included Lt. W.’s question about the blood in his UOR, even though he may not have seen it himself.
This contradiction might have gone unnoticed, except for the tone and manner in which Lt. Col. M. delivered his colorful statement “I pointed my eye on him.” His demeanor in court indicated the statement was not hyperbole, but reflected a deliberate, knowing, and intentional act at the time it was done — enough so as to leave an impression on the witness’ memory.
The issue of the presence of blood at S.D.’s mouth comes up again in the form of a written statement for PZT by Cadet Shirley Mitchell. She wrote that she “escorted [S.D.] to the infirmary. I didn’t see any injury to [S.D.] or hear any complaint from him. I left him in the infirmary and returned to my post.” Defendant’s Exhibit -12, p. 50. Yet, the blood was apparent to Lt. W.
On cross-examination, Lt. Col. M. stated that his original UOR was wrong, namely that it was not true that he grabbed S.D. by the left arm. V.3, p. 19, In. 9-12. But, apparently it was correct when it stated that Lt. W. grabbed “the other arm [the right arm] and held him against the wall.” V.3, p. 19, In. 13-15. Lt. Col. M. made no effort to explain or comment on how he made a such a mistake in a written statement only four sentences long. It is also troubling that this “untrue” statement *426 about grabbing S.D.’s left arm appears prominently in Lt. W.’s UOR.
Lastly, Lt. Col. M.’s testimony contradicts his UOR statement in the same manner that Lt. W.’s testimony contradicted his own, by changing their story from simultaneous joint action to independent action. Only the UORs has them stop the youth in concert, hold him jointly — one on each arm, each ask him a question, then together send him off to the infirmary due to the blood on his mouth noted, but not seen by Lt. Col. M. On the stand, Lt. Col. M. ignored the specificity 11Bof his UOR— no mention of grabbing S.D.’s left arm— and he reduced Lt. W.’s role to that of a bit player wandering into the scene from nowhere. Under cross-examination, Lt. Col. M offered no other explanation of this contradiction than to matter-of-factly acknowledge the difference with a “yeah.” V.3, p. 21, In. 13-16.
On the allegations made by S.D., the Court finds that the testimony of both Lt. Col. M. and Lt. W. to be internally inconsistent, contradictory of one another, and contradictory of their own original UOR statements.

Project Zero Tolerance Investigations

DOC operates a hotline phone and reporting system for incarcerated youth to anonymously report physical abuse. This program is called Project Zero Tolerance. There is a PZT team at each juvenile facility. The PZT staff conducted two investigations of S.D.’s allegations: one occurred in the days following the incident (hereafter, PZT1); the second was performed in August (hereafter, PZT2). The results are interesting.
PZT1 concluded that S.D. suffered a broken jaw. There was no finding as to how or who injured him. The report did bring to light an alternative to the previously noted pole hitting and guard abuse explanations of the fracture. PZT interviewed seven Tallulah youth in school that day. two of whom said they saw S.D. in a fight that morning with Of the seven interviewed, three gave statements saying they saw Lt. W. strike S.D. in the jaw; two said they did not see Lt. W. and S.D. together, but they did observe e fight between S.D. and M.G.[5] — another inmate who subsequently completed his time and went home; two others saw Lt. W., Lt. Col. M. & S.D. together at some point, but saw no violence.
The two youth who implicated M.G. testified at the hearing. J.M. and D.F. testified that they witnessed M.G. break S.D.’s jaw. However, their testimony is remarkably inconsistent and contradictory. J.M. stated that M.G. quickly struck S.D. two times to the face from the front, causing S.D. to fall to the concrete. J.M. also said M.G. kicked S.D. before going off to play basketball with J.M. V. 2, p. 23, In. 17-30; p. 24, In. 1-6. In stark contrast, D.F. stated that Greely punched S.D. only one time, that blow coming from behind, not from the front. D.F. said the two kids brawled on the grass, not concrete. V.2, p. 52 — p. 56.
l1fiThe Court is familiar with J.M. from his sentence review hearings. J.M.’s demeanor and attention were markedly different than his prior appearances. J.M. has always been open, realistic, and cooperative. At this hearing he appeared hostile, evasive, and uncooperative. He sat slumped in the witness chair, making little or no eye contact with anyone. At one *427 point, the Court had to ask if he was falling asleep. V.2, p. 41, In. 1-17. He was uncomfortable and impatient to leave. He claimed to not be able to recall' events and conversations so often, the Court stopped counting. The court found the testimony of both D.F. and J.M. to be unreliable and of little assistance.
M.G. testified he has never had a fight with S.D. and did not break his jaw. V.2, p. 82, In. 23-29. More significantly, he testified that he was on “work detail” on this day, having already obtained his G.E.D. Youth who are not required to attend school are assigned to the “work detail” alone or in groups to perform labor at various locations at the facility. Under cross-examination, the State brought out the following testimony: V.2, p. 88, In. 3-17.
State: So, in the mornings they’ll [guards] come and get you and then—
M.G.: —Yeah, then I go.
State: And they escort you to your detail?
M.G.: Yeah.
State: And, someone is with you from the time you get up to until you go to detail, is that correct?
M.G.: Right. Someone is with me when I go to detail. Then they come get me after I eat. Then we go on detail. I be like that all day until-lunch. When lunchtime come I go back to the dorm; line up; and then after that go back on detail again.
From this testimony, it is apparent that at the time S.D. sustained a fractured jaw, M.G. was under supervision at the dorm-awaiting escort to his detail, being escorted to the detail, or already working on the detail. DOC offered no witnesses to contradict M.G.’s testimony on this point.
The PZT-2 investigation team wanted to talk to M.G. One investigator testified that he conducted a brief interview with M.G. by phone, during which MG. said “he didn’t know anything what [sic] I was talking about,” hung up, and refused to answer the phone when 1 ^immediately called back. V.2, p. 74, In. 6-21. This conversation is said to have lasted less than one minute. M.G. contradicted this testimony, stating the conversation lasted more than five minutes, during which time the PZT investigator asked if he had fought with S.D. at any time, to which M.G. told him he had never had a fight with S.D., nor did he witness any fights with S.D. V.2, p. 85, In. 11-25.
The investigator’s testimony was further contradicted by the DOC Phone logs for the date and time of the investigator’s call to M.G. The phone log showed the conversation lasted seven minutes, thus confirming M.G.’s testimony. Defendant’s Exhibit — 12, p.71. M.G. made a compelling witness. He answered questions directly and openly. At one point under cross-examination, he turned from the DOC lawyer, and asked S.D. “The dude right here [pointing at S.D.] — ain’t you Joseph Allen’s cousin, you know what I’m saying. Me and Joseph like this here [holding up two erossed-fingers]. Why would I beat up his cousin, you know what I’m saying?” V.2, p. 90, In. 11-13. He appeared genuinely baffled that he was considered a participant in this incident.
M.J. was the only other Tallulah youth to take the stand He stated he was in school that morning and walked in to find “Lt. W. hacking S.D. up.” V.2, p. 63, In. 19-21. By “hacking up” he meant “in like, an anger type hacking up; like, tugging on his shirt; like, trying to rip it up and stuff like that.” Ibid., In. 28-30. Significantly, he described S.D. as having “blood on his *428 mouth and stuff’ when he saw him next in class. Ibid., In. 22-23.
On May 21, 2001, M.J. gave a written statement: “I was walking into my classroom in [sic] I happen to see Lt. W. hit S.D.” Defendant’s Exhibit -12, p. 68. In August, he gave a second statement in which he described the same scene, but wrote that S.D. “was getting hacked up by Lt. W.” Ibid., p. 66. In testimony he explained the change from “hit” to “hack up” by saying he wrote “hit” in May because he did not know how to spell “hack.” V.2., p. 65, In. 7-8. M.J. was a credible witness. Despite the change in statements, his testimony was straightforward and told clearly. He places Lt. W. and 5.D. in the hall in some form of confrontation. Because he left the hallway and went into class, he was unable to observe any other interaction that may have occurred between them.
JjgThe PZT-1 investigation results caught the attention of the U.S. Department of Justice. See Independent Auditor’s Letter to DOC, Defendant’s Exhibit - 12, p.30-31; in contrast, see Auditor’s undated Letter to DOC, Ibid., p. 27. It is not surprising that DOJ reviewed the report and required DOC to do it again. The PZT2 investigation produced a much longer report, in which many more witnesses were interviewed and some inconsistencies from the first investigation were straightened out. However, PZT2 came to the exact same conclusion as PZT1: S.D. suffered a fractured jaw of indeterminate origin.
The focuses of these hearings were S.D.’s allegations of abuse and the conditions of his confinement at Tallulah. Taken in their entirety as a work product, PZT investigations were not reviewed here. Nonetheless, they were highlighted by both parties due the integral part they played in the development of testimony and. evidence regarding these events. Other than in a specific instance described below, the Court makes no findings of fact as to the conduct of these investigations.[6]

Findings of Fact

In preparing this judgment, the Court has considered the grave nature of the allegations, the arguments of both sides— both oral and written — and conducted a line by line review of the more than four hundred pages of testimony in this proceeding, as well as examining each of nearly two hundred pages of exhibits introduced into evidence.
Thus, considering the totality of the circumstances as presented by the testimony and evidence, the Court makes the following findings of fact, to wit:
1. On May 18, 2001, S.D. suffered a fractured jaw when Lt. W. punched him in the face.
2. Lt. Col. M. had his arm around S.D.’s neck in a chokehold at the time Lt. W. struck the youth.
3. The altercation occurred after S.D. jokingly told a guard he was exempt from attending school that day. In fact, he had no such exemption.
*429 |194. The Project Zero Tolerance Investigation suppressed persuasive exculpatory evidence that disputed the premise that M.G. struck and fractured S.D.’s jaw, by (1) omitting from its final report M.G.’s strong denial of involvement in any altercation with S.D. at any time and his denial of having fractured his jaw; and (2) stating that when contacted by phone, M.G. quickly hung-up after denying knowledge of the event. DOC’s own phone records established the conversation lasted seen minutes.

S.D. ’s Individual Needs

In her Special Expert Report (three parts: 4/12/01, 9/10/01 and 9/24/01 Addendum) on S.D., Dr. Guin itemized the following findings:
Cognitive Ability
On the Wesehler Adult Intelligence Scale-Ill, the standard intelligence tool used by the social service field today, S.D. measured in the low average range (approximately 80-90). She noted that this might be an underestimate as he had scored a 95 previously on this test when administered upon entering DOC custody last fall.
Psychological & Neurological Evaluations
On August 24, 2001, at the direction of Dr. Guin, a team composed of Dr. Tom Merrill and Colleen Carney, M.A. evaluated S.D. Their evaluation indicated (and confirmed previous results) that S.D. suffers from “serious depression” and has a limited capacity to solve problems. They identified his major problem areas as depression and limited coping skills.
Research-Based Treatment & Intervention
Dr. Guin reported that a review of the academic research on treatment for youth who have problems similar to Sean’s reveals ample evidence of effective methods of intervention to treat and rehabilitate him. She included the following points from the research literature:
1. It is not possible to effectively treat sexual abuse victims without providing a safe environment for them.
2. Treatment services should be provided for individuals with different levels of severity or dysfunction.
3. Treatment should emphasize positive reinforcement for pro-social behavior and be as individualized as possible.
4. Treatment should be of sufficient frequency, intensity and duration to adequately address identified needs of the individual youth.
5. Possible clinical issues such as depression must be treated.
|2n6. Treatment should be provided in a safe environment conducive to healing by maintaining appropriate staff ratios, providing ongoing staff training on mental health issues, disciplines and safety procedures.
After a review of DOC records for treatment and rehabilitation for this youth, Dr. Guin determined that “virtually none” of the research-based interventions have been used in Sean’s case. This finding is remarkable in light of the legislatively adopted differences between adult and juvenile criminal proceedings being that incarceration of youth is for the sole purposes of treatment and rehabilitation.

Recommendations for Treatment

Dr. Guin’s LSU team made the following recommendation to the Court on future treatment and rehabilitation therapy for S.D. It represents a treatment plan tailored to meet his individual needs, which are considerable.
*430 1. Intensive cognitive behavioral treatment to address depression, sexual and physical abuse, and the trauma of witnessing his mother’s murder. Components of this therapy will be: problem solving, anger management, coping and social skills training.
2. Substance abuse education, treatment and monitoring.
3. Educational and vocational assessment and placement.
4. Complete psychological and psychiatric evaluation to determine the appropriateness of psychotropic medication.
5. Family counseling to work on the long-range goal of placement with suitable family members.
6. Evaluation of Sean and his father for possible work towards reconciliation.
Most important of all, Dr. Guin stated that all literature agrees on one universal point: no youth will benefit from any rehabilitation or treatment program — no matter how sophisticated or expensive — if that youth does not feel physically and emotionally safe. Mazlow’s Hierarchy of Needs neatly makes the point that human beings require food, shelter, clothing before moving on to higher development. The foundation of that development is personal safety. Thus, a threshold requirement for S.D. to make any progress in rehabilitation and treatment is for him to be in a safe place: a place where he feels safe from harm and threats on a daily basis. Lastly, she stated “there is nothing to suggest that he cannot develop the skills to become a law-abiding citizen, with appropriate intervention and socialization efforts.” Guin Report, 9/10/01, p.5

Conditions of Confinement

Lt. Col. M. freely painted a disturbing picture of daily life at Tallulah. He acknowledged that fractured jaws are not an unusual occurrence at the facility, stating “it’s not uncommon.” V.3, p. 12, In. 23. Sadly, not one witness contradicted his testimony. In fact, no DOC witness contradicted the testimony of S.D. or of any other incarcerated youth — past or present — that life at Tallulah is violent, that vulgarity, incendiary profanity, and the expression of aggressively hostile feelings constitute the normal tone of interactions between guards and youth on both sides. V.l, p. 18 In. 1-4.
Aggression, violence, and the use of force appear to be accepted methods of settling disputes. Again, in uncontradict-ed testimony, guards often refuse to intervene, or turn their back, in order to protect one youth from another or to indicate concern. V.l, p. 10, ln.12-30; p. 11, In. 1. Almost every witness confirmed that there are fights on a regular basis; so much so that Lt. Col. M. opined that “when they [incarcerated youth] gather you know something is going to happen.” V.3, p. 26, In. 2. He said that there had been two fights in the school area the week S.D. was injured and two that morning. He feared more. Lt. Col. M. stated that on the morning in question, he was trying to avoid “mass chaos like it already was.” V.3, p. 5, In 22.
Records produced by DOC in response to the Court’s subpoena duces tecum confirm the experience of the witnesses. Of the Accident & Injury reports presented to the Court for the months of May and July 2001, the following information can be gleaned:
*431 May 2001 July 2001
Total No. of Accident & Injury Reports[7] 147 206
No. of Injuries 140 84
No. of Serious Injuries 7 6
No. of Fights 80 84- .
No. of Fights (with injury) 18 45
No. of Fights (without injury) 6 39
No. of Accidents 24 (unable to determine)
No. of Uses of Force 22 7
(by guards producing injury to youth)
NB: There are approximately 400 youth held at Tallulah on a daily basis; Approximately 300 staff members plus 20 counselors Y.2, p. 235, In. 10-15.
| a-DOC also produced records of the Infirmary’s Daily Log for the months of May-October 2001. These documents are far more detailed and difficult to examine, but they contain a record of all youth held in the infirmary overnight for serious injuries or observation. The following statistics reveal the figures for June 2001.[8]
Rape 3
Fractured Jaw 3
Serious Trauma to Jaw 4
Fractured Hand 2
Serious Trauma to Hand 2
Fractured Forearm 1
Fractured Nose 1
Ear Lacerations 2 (requiring sutures)
Eye Trauma 3
Taken as a whole, the Accident & Injury Reports and the Infirmary Daily Log suggest that in any given month, approximately 20-25% of the total population of incarcerated youth are involved in some event that produces an injury of whatever magnitude — great or small. Most disturbing is the number, of broken bones, particularly, fractured jaws. The Court specifically notes that these figures are not presented here to imply that they represent injuries inflicted by guards. Without follow-up information from the PZT investigation unit on each entry,- there is no way to know what, if any, guard involvement there may have been.
But the point is that these figures are disturbing in their own right. They are a snap shot of the accidents and injuries from one randomly chosen month. As- *432 snming that no guards were involved in any of these events, meaning that they represent only youth on youth altercations, the injuries are at an alarming level for the population size. This is especially true in view of the fact that youth are under almost constant adult supervision.
In this climate, it is no wonder that week-in-week out this Court is faced with report after report on incarcerated youth who attend individual and group counseling sessions on anger management, conflict resolution, expression of feelings, and victim awareness, yet regularly demonstrate little or no progress in these areas of human interaction. The conclusion is almost 1 ¡.¿inescapable they have no opportunity to put these concepts into practice- — ■ if they are able to absorb them at all under thése conditions.
What appeared from these hearings is a bleak picture regarding the violence and anxiety that characterize Tallulah. Youth are confronted with the potential of physical danger from numerous directions: other youth, guards and staff. One question jumps quickly to mind: where in this place does anyone, can anyone feel safe? From the testimony and evidence produced, it seems that there is no such place, no “safe haven” at Tallulah. Sadly, the closest a youth may come to relief from the threat of violence may be in solitary confinement — which leaves its own mark on emotional health.
This raises the issue of Tallulah’s practices regarding adolescent "behavior & rehabilitation and the training guards and staff receive in this discipline. Under cross-examination, Warden Guyton testified that to become a correctional officer at Tallulah, an applicant must be 18 years old and pass the Correctional Officer Examination administered by DOC. Thus, there is no educational requirement for a corrections officer: an applicant does not need a High School Diploma, G.E.D., or any prior experience.[9] V.2, p. 235, In. 20-26.
Contrast this standard with information found at the U.S. Department of Labor, Bureau of Labor Statistic’s “Occupational Outlook Handbook,” that states “most institutions require that correctional officers be at least 18-21 years of age, have a high school education or its equivalent, have no felony convictions[10], and be a U.S. citizen. Promotion may be enhanced by obtaining a post-secondary education.” [11]
When asked on cross-examination how many correctional officers at Tallulah are college graduates, Warden Guyton stated that he had “a few.” When asked how many that might be, he admitted he had no idea how many were college graduates. V.2, p. 236, In. 1.
A correctional officer’s starting salary is $18, 360 per year.[12] As a result, Tallulah has had a very high job turnover rate. Guyton testified that the turnover rate since Summer 2001 has been much less than at previous times. V.2, p. 240, In. 19-21. He stated that he presently has a | ¡.¿turnover rate below 100%. Ibid., In. 24. However, he has a “pretty high” over time rate to cover vacant positions. A working guard’s position is called a “drop” at DOC. Guyton went on to explain that
*433 with the number of officers I’m assigned I don’t think it’s the adequate number of officers to cover all those drops. However, I deal with what I have. And I have to use over time to cover those drops. Over time has been cut a great deal where you have officers work two hours over time instead of working twelve hours over time. V.2, p. 242, In. 8-23.
Though the ratio of female to male guards was 70/30 when he arrived at Tallu-lah, Guyton said he has been able to bring that number into balance at almost 50/50 male/female. V.2, p. 244, In. 24-26. The significance of this ratio is that Tallulah is a facility for adolescent males only. Right now, one half of the guards are female, with one female and one male assigned as a team to an area. Prior to this 70% of the guards supervising these young men were female. Ibid., In. 21-23.
The normal work shift for staff is twelve-hours. Without shift-length information from other states, the Court is unable to determine if DOC’s shift is as disturbingly long as it appears. However, reason would suggest that a twelve-hour shift under these working conditions might serve to inflame an already stressful atmosphere. Warden Guyton explained that in a two-week pay period, guards work two days in one week and five days for one week. They work a total of 80 hours, plus six hours set aside for “roll-call training.” V.2, p. 253, In. 13-26.
The Court notes that there is no difference in hiring requirements between a corrections officer assigned to an adult facility and one stationed at a juvenile institution, which would suggest that specialized adolescent behavior training would be important and helpful for juvenile facility employees. Warden Guyton testified that the department does require employees to attend departmental training seminars. However, although he has been part of DOC’s juvenile correctional system since 1984, and asserted that he has had a great deal of training experience, he could not name or describe one training seminar, course, or program of study regarding adolescent development or rehabilitation for juvenile delinquency prevention that he had participated in or attended during the past 17 years. V.2, p. 238, In. 24-28.
From this it becomes apparent that among other things, part of the problem at Tallulah may be attributable to: the limited job applicant pool to fill positions, inadequate training, both orientation and in-service training, the 12-hour work shifts under stressful and violent conditions, | ?»Rand the continuing overtime problem. Individually, these factors might not have an impact on operations and institutional culture. Taken collectively, it seems reasonable to conclude that have a cumulatively negative impact on the quality and safety of this facility.
Findings of Law Federal Due Process
At the very least, the Due Process Clause of the Fourteenth Amendment to the United States Constitution “requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.” Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). With respect to juveniles adjudicated delinquent under state laws, federal courts have repeatedly held that where “the purpose of incarcerating juveniles in a state training school is treatment and rehabilitation, due process requires that the conditions and programs at the school must be reasonably related to that purpose.” Morgan v. Sproat, 432 F.Supp. 1130, 1135 (S.D.Miss.1977). See also, Al *434 exander S. v. Boyd, 876 F.Supp. 773, 796 (D.S.C.1995) (holding the same) (citing Martarella v. Kelley, 349 F.Supp. 575, 585 (S.D.N.Y.1972); Pena v. New York State Division for Youth, 419 F.Supp. 203, 206-07 (S.D.N.Y.1976)).[13]
Under this standard, outright physical abuse of a youth in a juvenile correctional facility violates that youth’s due process rights under the Fourteenth Amendment to the United States Constitution. Courts have consistently condemned the use of force or corporal punishment against children in correctional facilities. Nelson v. Heyne, 355 F.Supp. 451 (N.D.Ind.1972) (beatings with a paddle), aff'd, 491 F.2d 352 (7th Cir.1974), cert den., 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); Morales v. Turman, 383 F.Supp. 53 (E.D.Tex.1974) (physical beatings and use of tear gas), rev’d on other grounds, 562 F.2d 993 (5th Cir.1977); Santana v. Collazo, 533 F.Supp. 966 (D.P.R.1982) (beatings of children who escaped from institution and were recaptured), affd in part and vacated and remanded in part, 714 F.2d 1172 (1st Cir.1983), cert. denied, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984); Milonas v. Williams, 691 F.2d 931 (10th Cir.1982) (grabbing children by the hair, | ^pulling them backwards, and flinging them against walls), cert. denied, 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983). Thus, any use of force at a juvenile institution must be reasonably related to its statutory purpose of treatment and rehabilitation.
In order to comport with federal due process standards, states must maintain a minimally adequate mental health treatment system in a juvenile correctional facility. See e.g., Youngberg v. Romeo, 457 U.S. 307, 322, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982) (substantive due process includes right to minimally adequate training for involuntarily committed mentally retarded persons). Minimally adequate mental health treatment should include trained staff providing services that may include the following: emergency mental health services, a professional evaluation and development of a treatment plan, periodic follow-up evaluations, and regular mental health services, including counseling. Gary W. v. Louisiana, 437 F.Supp. 1209, 1219 (E.D.La.1976) (requiring individualized assessments and treatment programs for mentally retarded, physically handicapped, and delinquent children in custody of state).
Finally, juveniles in correctional facilities have a federal constitutional right to an adequate educational program.[14] Donnell C. v. Illinois State Bd. of Education, 829 F.Supp. 1016 (N.D.Ill.1993) (finding a *435 lack of instruction gave rise to claim under substantive due process); Robin A. v. McCoy, Civ. No. 90-1151 (D. Or. April 23, 1992) (consent decree provided for educational services in classroom setting for each child on school days). Incarcerated juveniles should be given appropriate educational testing upon admission. Morgan v. Sproat, 432 F.Supp. 1130 (S.D.Miss.1977); Inmates of Boys Training School v. Affleck, Civ. No. 4529 (D.R.I. January 15, 1979) (previous opinion 346 F.Supp. 1354 (D.R.I.1972)). Institutional staff should develop individualized educational plans appropriate to each child. Gary W. v. Louisiana, 437 F.Supp. 1209 (E.D.La.1976); Morgan v. Sproat, supra; Inmates of Boys Training School v. Affleck, supra. Institutions must provide sufficient resources to implement such plans. Doe v. Holladay, No. CV-77-74-BLG (D. Mont. April 1, 1982); Inmates of Boys Training School v. Affleck, supra.
|CTIt is axiomatic that a violent blow to the face resulting in a fractured jaw, the medical attention and the need for weeks of recuperation and follow-up care are not justified as being related to S.D.’s treatment and rehabilitation as an adjudicated juvenile delinquent. There is no constitutional justification for fracturing the jaw of an incarcerated youth against whom there is no allegation and no evidence that he posed any danger to himself or others.
Accordingly, this Court finds that S.D.’s rights under the 14th Amendment to the Constitution of the United States have been violated while in the custody of the Department of Corrections at the Tallulah facility.
State Constitutional and Statutory Protections
Article 1, § 2 and Article V, § 19 of the Louisiana Constitution of 1974 govern the constitutional rights of juveniles in Louisiana.[15] Due process rights guaranteed by Article I, § 2 of the Louisiana Constitution exceed those guaranteed by the Fourteenth Amendment to the United States Constitution:
[T]he individual rights guaranteed by our state constitution’s declaration of individual rights (Article I) represent more specific protections of the individual against governmental power than those found in the federal constitution’s bill of rights, and they represent broader protection of the individual.
Guidry v. Roberts, 335 So.2d 438, 448 (La.1976). In addition to the enhanced protection of individual rights afforded juveniles through Louisiana’s due process clause, juveniles adjudicated delinquent of crimes have the constitutional right to “special juvenile procedures which shall be provided by law.” La. Const. Art. V, § 19. The Louisiana Supreme Court has read the provisions of Article V, § 19 to dictate “a general rule of ‘non-criminal’ treatment of juveniles.” In re C.B., 97-2783 (La.3/11/98); 708 So.2d 391, 396.
The Louisiana Supreme Court has proclaimed -that:
[T]he unique nature of the juvenile system is manifested in its noncriminal, or civil, nature, its focus on rehabilitation and individual treatment rather than retribution, and the state’s role as par-ens patriae in managing the welfare of the juvenile in state custody.
*436 In re C.B., 708 So.2d at 396-97 (emphasis supplied). Indeed, the provisions of the Louisiana Children’s Code not only-highlight the juvenile justice system’s focus on rehabilitation and individual treatment, but specifically point to the state’s duty to act as a parent with respect to children in custody. La. Ch.C. art. 102 (West 2000) provides:
The provisions of this Code shall be liberally construed to the end that each child and parent coming within the jurisdiction of the court shall be accorded due process and that each child shall receive, preferably in his own home, the care, guidance, and control that will be conducive to his welfare. In those instances when he is removed from the control of his parents, the court shall secure for him care as nearly as possible equivalent to that which his parents should have given him.
Id. (emphasis supplied); see also La. Ch.C. art. 801 (West 2001) (specifically governing delinquency proceedings, echoing same language).
The Louisiana Children’s Code is instructive in determining what constitutes “care as néarly as possible equivalent” to that which a child’s parent owes him. In Child in Need of Care proceedings, the state may take a child out of his parent’s custody and into state custody if there are reasonable grounds to believe a child is a) “the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker”; or b) “a victim of neglect.” La. Ch.C. arts. 606, 619, 626 (West 2001).
“Abuse” is defined in part as “[t]he infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by the parent or any other person.” La. Ch.C. art. 603(l)(a) (West 2001).
“Neglect” is defined as “the refusal of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health is substantially threatened or impaired.” La. Ch.C. art. 603(14) (West 2001). If the state later demonstrates by a preponderance of the evidence that a child is in need of care, the child remains in state custody. La. Ch.C. art. 665 (West 2001). Thus, as a matter of law, in order for this Court to protect a juvenile’s constitutional rights in delinquency proceedings, the Court must ensure that a child receives care that as nearly as possible does not constitute abuse or neglect.
| ¡^Because S.D. has demonstrated that his due process rights have been violated and that he has been abused as defined by state law, his care while in the custody of the Louisiana Department of Corrections at the Tallulah facility, violates his constitutional rights under Article I, § 2 and Article V, § 19 of the Louisiana Constitution. Guards have inflicted physical injury upon S.D., and the authorities in charge there have not acted to prevent such injury.
Additionally, Tallulah has not provided the necessary care, treatment, and counseling to meet S.D.’s identified needs regarding substance abuse counseling, counseling for victim’s of physical and sexual abuse, remedial education and vocational training services, and his need for on-going psychiatric care and treatment by psychotropic medication.
Accordingly, the Court finds that the above-enumerated conduct, to which the state subjected S.D. by means of the operations and personnel at Tallulah, is a viola *437 tion of the youth’s rights under Article I, § 2 and Article V, § 19 of the Louisiana Constitution of 1974.

Summary

From a review of the record, including S.D.’s personal history as recounted at the beginning of this judgment., the Court recognizes that this youth has been, through no fault or action of his own, regularly exposed to violence and abuse even before his placement at Tallulah. It is difficult to identify a particular event in his life that precipitated the deterioration of his behavior — any one of his misfortunes would suffice — such that he committed several crimes and was in desperate need of treatment and rehabilitation, necessitating his removal from the custody of his great-aunt and his placement in the care and custody of the Department of Corrections.
S.D.’s placement in state secure custody was for the avowed purpose of rehabilitation. Simply put, the goal was to take a young life and try to get it back on track— while there was still time and hope — so that he might come to five as a full member of society. Instead, he wound up in a place that maintains order through fear, force and violence. The atmosphere of fear at Tallulah supports a culture of violence sadly manifested by the high number of violent physical injuries sustained by incarcerated youth — from whatever cause — at that facility.
We cannot reasonably expect young men incarcerated under these conditions to ever feel physically safe and emotionally secure, such that they might benefit from treatment or that the 13nrehabilitative process might begin. No human being fearful of physical attack can focus on anything but survival -wherein survival is defined as no harm done. The department spends a great deal of money on this institution. It is important to examine whether the recidivism and injury rates justify the expenditure.
In the exhausting wake of the adversary process, one needs to keep the human dimension of S.D.’s case in perspective. This was never a matter in which a violent fight broke about between two youths, nor a situation where a youth refused to comply with a lawful order and began wildly attacking a guard, thus necessitating the use of force to rescue to rescue the guard or to restrain the youth. This is a case of uncontradicted testimony that the- youth remained respectful, compliant and cooperative at all times with orders given — even as he awaited treatment for a fractured jaw.
This case is about one adult male authority figure striking a youth with such force as to break his jaw, while the youth is immobilized by another adult male authority figure choking him around the neck. At its most basic human level, this is an awful abuse of physical power.
Based on the testimony, evidence, and expert reports entered into the record herein, this Court finds that the conditions of S.D.’s confinement and the lack of individual rehabilitative treatment at the Tal-lulah facility are unconstitutional. Such unconstitutional treatment of a youth that has been placed in state custody for the purpose of rehabilitation cannot be tolerated if we are to maintain any hope for the future of our youth. Human dignity and the constitutions of the United States and State of Louisiana, demand no less.
For the foregoing reasons,
IT IS ORDERED ADJUDGED, AND DECREED, that S.D.’s Motion to Modify the Judgment of Disposition of September 21, 2000 on the basis of unconstitutional conditions of confinement is hereby GRANTED.
*438 Judgment rendered in open Court on the 17th day of December 2001.
Reasons for Judgment prepared, read and signed this 17th day of December 2001, in Chambers at New Orleans, Louisiana,
/s/ Mark Doherty MARK DOHERTY, Judge

. Since the individual at issue is a minor his initials will be used throughout this opinion.

. The Court will use this formula hereafter to quote from the three volumes of transcripts from these hearings.

. The Court will employ initials when referring to the principals involved in the allegations.

. In the parlance of youth in DOC custody, "snuck” means to punch or hit an individual without warning or from a blind side, so that the victim is unaware of the impending blow.

. DOC requires guards to complete an Unusual Occurrence Report every time force is used on an offender.

. M.G. was released from Tallulah on May 20, 2001, having completed his sentence. He is an adult, gainfully employed and pursuing a G.E.D. He has had no further problems with the law. M.G. made a compelling witness.

. The PZT investigation raises serious questions about the independence and autonomy of the PZT Program due to the close working relationship between the investigators and Tallulah staff that arises from the on-site location of the investigation office. Also, the Court finds Warden Guyton’s frank testimony that he reviews the PZT reports prepared at Tallulah very disturbing: "if I find anything I don’t like in it I send it back to them for them to redo it.” In regard to PZT1 report, he added "I didn’t find anything wrong with the report” — so he did not send it back. V.2, p. 230, In. 8-21. Guyton’s practice undermines the credibility of the program.

. These statistics come from the documents actually produced by DOC. The Court has no way to verify that these represent the total number of Accident & Injury reports generated during these months. There were many duplicates of the same report.

. These statistics are based on the documents actually presented to Court and may not reflect the total number of Infirmary Log entries for this period.

. A brief tour of the DOC website confirms this information, found at www.correc-tions.state.la.us/employment.

. Louisiana has similar requirements regarding criminal background.

. See Bureau of Labor Statistics website: http://stats.bls.gov/oco/ocosl56.htm

. See DOC Website under the heading "Employment.”

. Some federal courts have premised a juvenile’s constitutional right to treatment and rehabilitation on an alternate theory, the quid pro quo theory. "[T]he quid pro quo theory provides that because juvenile delinquency proceedings generally do not involve the full range of procedural due process protections of a criminal trial, the state must provide rehabilitation to incarcerated juveniles to make up for the difference.” Alexander S., 876 F.Supp. at 796 (discrediting the theory on the basis of O’Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring)). In In re C.B., 97-2783 (La.3/11/98); 708 So.2d 391, 397, the Louisiana Supreme Court adopted the quid pro quo theory of rehabilitative treatment for juveniles as a guiding principle in determining that "the applicable due process standard in juvenile proceedings is fundamental fairness.” Ibid.

. The law cited applies to general education. In addition, if a school district has determined that a child is in need of special education, it may be required by state law to provide special education services to a child even though the child is in the custody of the state by court order.

. La. Const. Art. I, § 2 provides: "No person shall be deprived of life, liberty, or property except by due process of law.”
La. Const. Art. V, § 19 provides in pertinent part: "The determination of guilt or innocence, the detention, and the custody of a person who is alleged to have committed a crime prior to his seventeenth birthday shall be pursuant to special juvenile procedures that shall be established by law.”